Filed 11/7/25  P. v. Lachan CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ALAN LACHAN,<br><br>    Defendant and Appellant. | H051522<br>(Santa Clara County<br> Super. Ct. No. C1515822) |

Defendant Alan Lachan was tried jointly with Jason Fitch for their participation in a string of armed robberies across the Bay Area in 2014 and 2015 that became known as the "meat market robberies."  The robberies were committed by a small group of males who concealed their faces and used firearms to steal cash and other property from small grocery stores and other businesses close to their closing time.  The suspects in the crimes included Lachan, Fitch, Chester Best, Frederick Jordan, Lontese Steward, and Joseph Rosales.  Each of these suspects except for Steward was identified at Lachan and Fitch's trial as a member of a gang known as the "Taliban."

The jury convicted Lachan of 60 total counts including conspiracy to commit robbery, participation in a criminal street gang, second degree robbery, felony false imprisonment, attempted second degree robbery, dissuading a witness by force, dissuading a witness with an act done in furtherance of a conspiracy, and possession of a firearm by a person prohibited.  The jury also found numerous gang and firearm allegations true.  Fitch was convicted of a lesser number of similar offenses, with

corresponding gang and firearm allegations found true. The trial court sentenced Lachan to an aggregate term of 35 years to life in prison, consecutive to 64 years eight months.

Lachan raises various alleged errors on appeal: the trial court erred when it failed to remove a juror for cause; substantial evidence does not support the gang offense and gang-related allegations, and the court did not instruct the jury properly on those allegations; the prosecutor played two rap music videos in violation of Evidence Code sections 352 and 352.2, the California Racial Justice Act, and constitutional provisions; the court erred in sustaining a claim of privilege regarding whether law enforcement used a "Stingray" device in the robbery investigation; the prosecutor committed misconduct in eliciting inadmissible testimony and in questioning a prosecution witness; substantial evidence does not support the "convicted-felon" element of the weapons possession count; the court erred when it failed to give a unanimity instruction concerning the weapons possession count; the sentences on several witness dissuasion counts must be modified; and the cumulative effect of alleged errors compels reversal of the judgment.

The Attorney General concedes that Lachan's conviction for active participation in a criminal street gang should be reversed and his gang and firearm enhancements (collectively referred to hereafter as "gang-related allegations") should be vacated, and that this offense and these allegations may not be retried. The Attorney General further concedes that the sentences on several witness dissuasion counts should be modified. In all other respects, the Attorney General contends that no error prejudicial to Lachan occurred.

We agree with the parties that the gang offense must be reversed and the gang-related allegations must be vacated, and that the sentences on several witness dissuasion counts may be readdressed upon remand. We further agree with Lachan that the prosecution should not have been permitted to play and introduce two rap music videos under Evidence Code section 352, although we conclude that the error was harmless given our reversal of the gang offense and the vacation of the gang-related allegations.

2

In addition, we find that Lachan has established a prima facie case that the prosecution violated the California Racial Justice Act by playing and using the rap music videos at trial, and we remand this matter to the trial court to conduct a hearing to determine if a violation of the California Racial Justice Act has been proven by a preponderance of the evidence. We find no error prejudicial to Lachan concerning the remaining issues.

## I. FACTUAL AND PROCEDURAL BACKGROUND[1]

A second amended information listed numerous counts against Lachan and Fitch. With respect to Lachan, these counts consisted of conspiracy to commit robbery (Pen. Code, § 182, subd. (a)(1); count 1),[2] participation in a criminal street gang (§ 186.22, subd. (a); count 2), 36 counts of second degree robbery (§ 212.5, subd. (c); counts 3-4, 7-9, 12-17, 19, 29-32, 35-38, 40, 50-54, 59, 62-68, 71-72), 11 counts of felony false imprisonment (§§ 236, 237, subd. (a); counts 10-11, 18, 20, 23, 33-34, 39, 44-45, 47), four counts of attempted second degree robbery (§§ 212.5, subd. (c), 664; counts 21-22, 69-70), three counts of dissuading a witness by force (§ 136.1, subd. (c)(1); counts 5, 41, 60), five counts of dissuading a witness with an act done in furtherance of a conspiracy (§ 136.1, subd. (c)(2); counts 6, 42, 61, 75-76), and possession of a firearm by a person prohibited due to a prior felony conviction (§ 29800, subd. (a)(1); count 74). The second amended information listed numerous gang and firearm allegations and a prior prison term allegation (§§ 186.22, subd. (b), 667.5, subd. (b), 12022.53, subds. (b) & (e)(1)).

Lachan and Fitch were jointly tried; other suspects from the series of robberies were not tried with them. The trial of Lachan and Fitch was lengthy. The prosecution called as witnesses employees and customers of businesses that were robbed, though these witnesses did not identify Lachan or Fitch because the robbers wore masks and other apparel to conceal their identity. Several law enforcement officers testified

---

[1] We provide an overview of the facts to provide context. We further describe the record evidence relevant to each challenge in our analysis, *post*.

[2] Unspecified statutory references are to the Penal Code.

concerning the investigation into the offenses, including their confirmation of cell phone numbers belonging to Lachan, Fitch, and other suspects and their use of pen registers to track the phones' activity and locations.[3]  Investigators secured a cell tower "dump warrant" and identified phones belonging to Lachan and Fitch as being in the area of robberies when they were committed.

The prosecution called two expert witnesses to testify concerning cell phone activity for Lachan, Fitch, and other suspects.  These experts testified that Lachan, Fitch, and other suspects communicated with each other before and/or after several robberies, and that location data from cell phone numbers associated with Lachan, Fitch, and others placed them at or near the scene of several charged robberies.  During the investigation, law enforcement continued to track suspects' cell phone movements and also installed a camera on a utility pole outside a residence associated with Fitch.  The camera footage and cell phone location data showed Lachan, Fitch, and others moving toward an area in June 2015.  Law enforcement responded to the area and observed Lachan and others enter a Carl's Jr. restaurant where a robbery was reported, but they did not arrest Lachan or the other suspects at that time.

The prosecution also called three experts in criminal street gangs.  Ed Soares, a police officer who had worked in both Menlo Park and East Palo Alto, testified that the Taliban is a criminal street gang that organized in 2004 or 2005, used green military camouflage to identify its members, and committed robberies, assaults, murders, and

---

[3] A law enforcement officer characterized a pen register as follows:  "A pen register is obtained through a search warrant or Court order that records the data of incoming and outcoming texts or phone calls from a phone.  It doesn't give you content of messages.  It doesn't give you the ability to listen to the content of conversations, but it gives you the -- the telephone numbers that is -- that is outgoing and incoming to that particular phone.  [¶]  It'll tell you the duration of each phone call, and it will give you a geographical location of a general area where that phone is located based on a cell phone tower that that phone call -- that the phone is connected to at the time of the call or text."  The officer testified that this information was provided "realtime," "immediately as the text is either incoming or a phone call is incoming or outgoing."

other crimes in East Palo Alto. Soares testified concerning past contacts he had experienced with individuals who he opined were either Taliban members or were associated with Taliban members. Soares also testified concerning the significance of tattoos Lachan exhibited, along with a photo showing Lachan posing with other gang members who displayed hand signals Soares said were associated with the Taliban. Chris Adair, a gang investigator in the Menlo Park Police Department, opined that several of the robbery suspects, including Lachan, were members of the Taliban street gang. Adair also testified concerning two rap music videos that the prosecution had played during its opening statement, stating that he observed Taliban gang signs or symbols in the videos and that he recognized in the videos two Taliban gang members who were suspects in the robberies. Finally, a supervisory special agent for the Federal Bureau of Investigation testified concerning a letter found in Fitch's possession that the agent testified related to Taliban street gang activity.

The prosecution's key witness in its case-in-chief was Steward, one of the males identified as participating in several of the robberies. Steward testified that he stole money from businesses using firearms with Lachan and Fitch. Viewing video evidence of each charged robbery, Steward testified as to his involvement and the involvement of Lachan, Fitch, and others in each one. Steward did not participate in every charged robbery. Steward testified that in a given robbery, the group would exchange phone calls and meet ahead of time, firearms would be distributed, and the group would wait until it was nearly dark and almost closing time before committing a robbery. Steward testified that the robbers would split any money taken. Steward also identified a sweatshirt as belonging to Fitch, testifying that Fitch dropped it at the location of one of the robberies. Testing of the sweatshirt revealed the presence of DNA consistent with that of Fitch and one other person not connected with the robberies.

Steward testified that after being released from incarceration in 2014, robberies were already being committed and because he needed money, he "just kind of fell in

5

place" and "started tagging along" in committing the robberies. He testified that the location of the robberies "[j]ust happened at random" and that "[n]othing was ever planned"; rather, members of the group would meet up and drive around until identifying a location to rob. Steward admitted that immediately after he was arrested, he lied to police by denying his involvement in the robberies, but he stated that he later admitted his involvement and agreed to testify for the prosecution without any specific promise regarding his sentence. In viewing video of the Carl's Jr. robbery, Steward testified that he recognized Lachan and that Lachan was the one who stated, " 'Open the safe or I'm going to kill you.' " On cross-examination, Steward denied that he was a gang member, that Lachan or Fitch were gang members, or that he had any knowledge of the Taliban gang. He also testified that when he first talked to police, he was using cocaine "pretty frequently," that he "smoked a lot of weed," that he consumed alcohol heavily, and that at the time his drug and alcohol use affected his memory.

The defense called an expert in forensic electronics, forensic analysis, and call detail records analysis. The defense expert looked at the last cell phone event (call or text) before and after the time of each robbery, and he testified as follows: "So the results of my analysis revealed that there are some events, some robberies where there are phones that are connecting to towers in the vicinity of robberies in close proximity to time. [¶] There are other robberies, the phones are not connecting to towers in those areas during those times and, in fact . . . there are some where the phone would have to travel quite a distance to be at a robbery." Fitch's sister-in-law testified that she never saw any indication that either Fitch or Lachan was a gang member. Two other witnesses testified as to Lachan's character for nonviolence. Neither Lachan nor Fitch testified.

The jury convicted Lachan of all but two counts in which he was named (count 13 alleging second degree robbery, and count 18 alleging felony false imprisonment), and found true all gang and firearm allegations associated with the counts of which Lachan was found guilty. The prior prison term allegation was dismissed. The trial court

6

sentenced Lachan to an aggregate term of 35 years to life in prison, consecutive to 64 years eight months.

This appeal timely followed.

## II. DISCUSSION

### A. *Failure to Remove Juror/Peremptory Challenge Requirement*

Lachan first asserts that the trial court committed reversible structural error when it failed to remove a juror (identified as Juror 25) for cause. Lachan acknowledges that he did not use a peremptory challenge against Juror 25 following the denial of the challenge for cause, but he asserts that forfeiture should not apply because "the trial court compounded its initial error of denying a valid defense cause challenge to juror 25 by erring a second time when it imposed an overly-broad prospective 'remedy' which eliminated the defense's ability to remove juror 25 with a peremptory challenge."

Lachan asserts that the trial court's actions were arbitrary and constitute structural error in violation of the Sixth and Fourteenth Amendments to the United States Constitution. The Attorney General asserts that Lachan forfeited the issue by failing to exercise a peremptory challenge against this juror, and that if the issue is not considered forfeited, the trial court did not err in denying the challenge for cause.

#### 1. *Factual background*

Juror 25 stated in voir dire that he worked for the San Jose Police Department as an information technology manager. Juror 25 made several statements concerning his relationship to members of the police department, including that police department members considered him to be "family" and the "same kind of people," and that he was worried that there was a "really high chance" a police officer testifying in the case would recognize him or he would recognize an officer.

Asked if he could set aside any prejudices if a law enforcement officer testified, Juror 25 stated that he would "try to do [his] best," but he did not believe law enforcement officers would lie. Juror 25 stated he would "believe the police officer more

7

than the people I don't know," he believes police officers "won't waste their time," and he did not know whether his connection to law enforcement officers would impact his ability to be fair and impartial. When asked if he would be worried about returning a not guilty verdict and facing " 'a roomful of detectives and patrol officers' " "to the degree that it would be hard to be objective" and whether "[i]t would be hard to reach a decision contrary to the position posed by the prosecutor," Juror 25 replied: "Yes." Juror 25 stated he would "try to do [his] best" to hold the prosecution to its burden of proof, and he thought this was "good enough" from his perspective.

Juror 25 further stated that he would "try to" be a good juror, but also stated "I doubt it" when asked, "[a]re you going to give it 100 percent?" Juror 25 stated he had "faith[]" in what police officers say, and he worried about the possibility that a police officer who would testify at trial might be someone he had assisted at work. Asked whether he would fairly and impartially evaluate the evidence, Juror 25 stated "[d]efinitely, I will," but he also stated that he worried he might not hold the prosecution to its full burden of proof and he did not want to "ruin the two young gentlemen's future." In brief voir dire from the prosecutor, Juror 25 stated that he could follow instructions, including instructions concerning credibility of witnesses such as police officers.

Challenges for cause were not placed on the record. However, the prosecutor later noted that the defense had challenged Juror 25 for cause, and that the trial court denied the challenge. Fitch's trial counsel then stated that despite extensive voir dire, Juror 25 did not provide assurance that he could be completely fair. The prosecutor stated that he had opposed the challenge for cause because Juror 25 stated he could be fair and impartial and would follow instructions. The trial court did not place its reasoning for denying the challenge for cause on the record. The trial court noted the defense had peremptory challenges remaining. Neither Lachan nor Fitch exercised a peremptory

8

challenge against this juror, and the defense expressed no dissatisfaction with the jury that was seated.

The parties later exercised peremptory challenges against several jurors and the prosecutor raised a *Batson/Wheeler* motion in response,[4] asserting that two-thirds of the peremptory challenges by the defense "have been of persons of Asian descent."  The prosecutor asserted:  "I believe I've established a pattern of systematically kicking Asian[] persons off the jury and I would ask the court to entertain why the defense attorneys kick each of those persons off of the jury."  The trial court then addressed the peremptory challenges of jurors characterized as Asian one by one with defense counsel, finding that a race-neutral basis existed for each one, though the trial court stated that it believed some of the challenges were "close."  With respect to two jurors, the trial court found that a race-neutral basis existed because the jurors equivocated as to whether they could be fair and impartial, though the trial court said one of the challenges was "very close to being not race neutral."  The trial court found that another juror's peremptory challenge was race neutral based on her connections to law enforcement personnel, though the trial court again found the challenge was "close."

The trial court then stated:  "What I will say to defense counsel is that this is somewhat akin to [Evidence Code section] 352, where every time you have evidence, the next piece of evidence has maybe less probative value.  This kind of works the other way. When you have multiple occasions where Asian persons . . . , when you have those people being peremptorily challenged and there seems to be very little if any objective reason for doing that.  I mean, as I say, it's kind of a low bar for what is objectively race neutral.  [¶]  But you know, it's kind of like first time, it's race neutral, no problem. Second time race neutral, no problem.  You get down to the fourth, fifth, sixth time it starts to make me really be concerned about whether it's truly race neutral."  The court

---

[4] *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*); *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*).

9

stated to defense counsel: "I want to caution counsel that I believe that you are very close to exercising a challenge, for example, the next person, if there is not a clear race neutral basis for doing so, I may be inclined to grant a *Wheeler* motion. You know, they kind of build on one another."

The trial court then told defense counsel: "[I]f the next one is not a clear reason, then -- I don't intend to at this point, dismiss the entire venire, but I may well say that challenge that you exercise is not going to be permitted and so I'm going to ask counsel that if you believe that your next challenge is going to be of a person who appears to be of Asian ethnicity, that you might be wise [to] bring that up and discuss that ahead of time and we will find out if [the prosecutor] believes and more importantly, whether I believe that it is truly a race neutral peremptory challenge." Fitch's trial counsel then asked the trial court what the remedy would be if the defense exercised a peremptory challenge against a person of Asian ethnicity that the trial court determined was not race neutral. The trial court responded that the remedy would be to rule that the defense could not exercise the peremptory challenge, or in case the defense repeatedly did so, to "dismiss[] the entire venire."

The defense did not peremptorily challenge Juror 25 or express dissatisfaction with the jury.

### 2. *Legal principles and standard of review*

"Challenges for cause are constitutionally guaranteed under the Sixth Amendment. [Citation.] Our state Constitution provides the same general right to a fair trial and an impartial jury . . . . [Citations.] In California, criminal defendants are allowed an unlimited number of challenges to prospective jurors for cause, which the defendants must use before exercising any peremptory challenges. [Citation.]" (*People v. Black* (2014) 58 Cal.4th 912, 916 (*Black*).)

A party may challenge a prospective juror either for cause or peremptorily. (Code Civ. Proc., § 225, subd. (b).) A party may challenge a prospective juror for cause for reasons including actual bias, defined as "the existence of a state of mind on the part of the juror in reference to the case, or to any of the parties, which will prevent the juror from acting with entire impartiality, and without prejudice to the substantial rights of any party," and implied bias, which exists "when the existence of the facts as ascertained, in judgment of law disqualifies the juror." (*Id.*, subd. (b)(1)(B)-(C).) Generally, no reason is required to be stated to peremptorily challenge a prospective juror. (*Id.*, § 226, subd. (b).) However, "[a] party shall not use a peremptory challenge to remove a prospective juror on the basis of the prospective juror's race, ethnicity, gender, gender identity, sexual orientation, national origin, or religious affiliation, or the perceived membership of the prospective juror in any of those groups." (*Id.*, § 231.7, subd. (a).)

"As a general rule, a party may not complain on appeal of an allegedly erroneous denial of a challenge for cause because the party need not tolerate having the prospective juror serve on the jury; a litigant retains the power to remove the juror by exercising a peremptory challenge. Thus, to preserve this claim for appeal we require, first, that a litigant actually exercise a peremptory challenge and remove the prospective juror in question. Next, the litigant must exhaust all of the peremptory challenges allotted by statute and hold none in reserve. Finally, counsel (or defendant, if proceeding pro se) must express to the trial court dissatisfaction with the jury as presently constituted. [Citation.]" (*People v. Mills* (2010) 48 Cal.4th 158, 186, fn. omitted (*Mills*).) "[T]he statutory right to peremptory challenges is 'subject to the requirement that the defendant exercise those challenges to cure erroneous refusals to excuse prospective jurors for cause.' [Citation.]" (*Black*, *supra*, 58 Cal.4th at p. 917.) "As a result, . . . an erroneous denial of a challenge for cause to one juror is not reversible error when it deprives a defendant only of a peremptory challenge to another juror. [Citations.]" (*Ibid.*)

### 3. *Analysis*

Lachan has failed to preserve his claim regarding the denial of the challenge for cause against Juror 25 by failing to exercise a peremptory challenge against this juror, exhaust his peremptory challenges, and express dissatisfaction with the jury as constituted. The defense was afforded 30 total peremptory challenges, with 20 of the challenges being joint challenges and the remaining 10 split between the two defendants. The defense had peremptory challenges available when it accepted the jury as seated.

The California Supreme Court has repeatedly rejected requests to abandon the forfeiture rule concerning denials of juror challenges for cause in analogous situations where the three requirements to preserve the issue for appeal were not met. (See, e.g., *People v. Suarez* (2020) 10 Cal.5th 116, 143; *People v. Winbush* (2017) 2 Cal.5th 402, 425-426; *People v. Rangel* (2016) 62 Cal.4th 1192, 1209-1210; *People v. Manibusan* (2013) 58 Cal.4th 40, 61; *People v. Jones* (2012) 54 Cal.4th 1, 45-46; *Mills*, *supra*, 48 Cal.4th at p. 186; *People v. Carasi* (2008) 44 Cal.4th 1263, 1290.)

Lachan argues forfeiture should not apply because the trial court "imposed an overly-broad prospective 'remedy' which eliminated the defense's ability to remove [J]uror 25 with a peremptory challenge." Lachan asserts that Juror 25's name indicates he is of Asian ethnicity and that the trial court imposed an unjustified "sanction" regarding defense peremptory challenges of persons of Asian ethnicity, and thus forfeiture should not apply. We conclude that forfeiture applies.

The trial court did not "sanction" Lachan or prohibit him from using additional peremptory challenges against prospective jurors of Asian ethnicity. The trial court suggested ("ask[ed]") that if counsel intended to peremptorily challenge a person who appeared to be of Asian ethnicity, they "might be wise" to bring up any such peremptory challenge with the trial court and with the prosecutor to work out the issue in advance. But the trial court did not order defense counsel to do so, and it did not limit the defense's ability to exercise peremptory challenges against persons who were or appeared to be of

12

Asian ethnicity. In fact, as the Attorney General observes, after the trial court's guidance the defense then expressed its intent to exercise a peremptory challenge against another prospective juror that the prosecution did not oppose, and the trial court stated the defense could permissibly exercise such a challenge. Because the trial court imposed no "sanction," Lachan's argument necessarily fails.

The trial court had found race neutral reasons for the exercise of peremptory challenges against jurors who expressed reservations similar to those of Juror 25. Several of the challenged jurors equivocated about whether they could be fair and described their connections to law enforcement officers. Juror 25's employment and his answers resulted in extensive voir dire, and we observe that the reservations he expressed were stronger than these jurors. He was in fact employed by the San Jose Police Department and viewed his relationship with law enforcement as familial. Given that the trial court found other jurors who expressed less connection with law enforcement were peremptorily challenged for non-race based reasons, the record does not support the inference that exercising a peremptory challenge against Juror 25 would necessarily have been futile.

Lachan cites *People v. Durrant* (1897) 116 Cal. 179 (*Durrant*), *People v. Lucas* (2014) 60 Cal.4th 153 (*Lucas*), disapproved on other ground in *People v. Romero and Self* (2015) 62 Cal.4th 1, 53, fn. 19, *People v. Box* (1984) 152 Cal.App.3d 461 (*Box*), and *People v. Singh* (2015) 234 Cal.App.4th 1319 (*Singh*) to argue that forfeiture should not apply "when there is a question about whether a biased juror took part in the trial through court errors." None of these cases supports his argument that forfeiture should not apply here.

In both *Durrant* and *Lucas*, our state Supreme Court concluded that forfeiture *did* apply because the defendants did not exercise all their peremptory challenges. (*Durrant*, *supra*, 116 Cal. at pp. 195-196; *Lucas*, *supra*, 60 Cal.4th at p. 259.) In *Box*, the Court of Appeal held that forfeiture did not apply even though the defendant used only nine of his

13

10 allotted peremptory challenges, but the court's decision was based in part on the fact that the defense had requested more peremptory challenges than it received and in part because defense counsel stated that counsel did not wish to risk using the last peremptory challenge on the juror in question. (*Box*, *supra*, 152 Cal.App.3d at pp. 463-464.) Here Lachan was not denied additional requested peremptory challenges and had peremptory challenges available at the time Juror 25 was challenged for cause. Finally, in *Singh*, the Court of Appeal held the defendant could challenge a finding that defense counsel committed a *Batson/Wheeler* violation because "[i]f the trial court erred in making that determination, then necessarily *any* remedy was unwarranted." (*Singh*, *supra*, 234 Cal.App.4th at p. 1329.) Here, the trial court made no such finding that a *Batson/Wheeler* violation occurred.[5]

Lachan had the opportunity to exercise a peremptory challenge against Juror 25 and had peremptory challenges available when the jury was empaneled without the defense expressing dissatisfaction. Therefore, Lachan has forfeited this issue.

### B. *Gang Offense and Gang-Related Allegations*

Judgment was entered in the instant case in June 2021. Later in 2021, Assembly Bill No. 333 (2021-2022 Reg. Sess.) (Assembly Bill 333) was enacted with an effective date of January 1, 2022. (Stats. 2021, ch. 699.) Relevant here, Assembly Bill 333 made

---

[5] Lachan also asserts that toward the end of the discussion with defense counsel about future peremptory challenges, the trial court stated it was "not going to revisit anybody," and this discouraged the defense from peremptorily challenging Juror 25. We do not read the trial court's statements similarly. Fitch's counsel asked: "The ones that have been dismissed, they're done. You're not going to revisit them?" The trial court replied: "No, I'm not going to revisit anybody. The[y're] gone for one thing, and number two, I'm not going to revisit challenges for cause that were made and denied." In context, the trial court's statement that it was not "going to revisit anybody" simply meant that jurors already dismissed would stay dismissed, and that the trial court would not consider anew any challenges for cause already made and denied. The trial court did not state that it would not permit peremptory challenges of any prospective jurors who were previously unsuccessfully challenged for cause.

the following changes:  "First, it narrowed the definition of a 'criminal street gang' to require that any gang be an 'ongoing, *organized* association or group of three or more persons.'  [Citation.]  Second, whereas section 186.22, former subdivision (f) required only that a gang's members 'individually *or* collectively engage in' a pattern of criminal activity in order to constitute a 'criminal street gang,' Assembly Bill 333 requires that any such pattern have been '*collectively* engage[d] in' by members of the gang.  [Citation.]  Third, Assembly Bill 333 also narrowed the definition of a 'pattern of criminal activity' by requiring that (1) the last offense used to show a pattern of criminal gang activity occurred within three years of the date that the currently charged offense is alleged to have been committed; (2) the offenses were committed by two or more gang 'members,' as opposed to just 'persons'; (3) the offenses commonly benefitted a criminal street gang; and (4) the offenses establishing a pattern of gang activity must be ones other than the currently charged offense.  [Citation.]  Fourth, Assembly Bill 333 narrowed what it means for an offense to have commonly benefitted a street gang, requiring that any 'common benefit' be 'more than reputational.'  [Citation.]"  (*People v. Tran* (2022) 13 Cal.5th 1169, 1206.)

Lachan challenges the use of gang-related evidence and instructions to convict him of the gang offense in count 2 and to find true the gang-related allegations. Specifically Lachan raises three issues:  (1) substantial evidence does not support the conviction and true findings for the gang offense and the gang enhancements under current law as revised by Assembly Bill 333; (2) the trial court's instructions on the gang offense and gang-related allegations were incorrect under current law as revised by Assembly Bill 333; and (3) substantial evidence does not support the specific intent element of the gang-related allegations under the law as it existed at the time of his trial, requiring reversal of the true findings on these allegations without the opportunity for retrial.

With regard to the third of these issues—whether substantial evidence supports the jury's findings on the gang-related allegations under the law at the time of trial—Lachan argues: "The testimony in this record which uniformly described a series of anonymously-committed robberies is insufficient under the old gang laws to prove that [Lachan and Fitch] acted with the specific intent to 'promote[], further[], or assist[] in any criminal conduct by gang members . . . .' (§ 186.22, subd. (b).)" Specifically, Lachan argues: "First, there was no evidence from which the expert or the trier of fact could 'discern' whether the defendants acted on their own or on behalf of a gang . . . . Second, the experts could do no more than give factually unsupported and wholly speculative opinions that the robberies were committed for 'possible' reasons such as to gain 'prestige' [citation], and earn 'respect and fear' . . . . Third, no one knew that alleged gang members were committing the charged robberies . . . ." As a result, he contends that the gang-related allegations should be vacated without the opportunity for retrial.

The Attorney General concedes that under the law as amended by Assembly Bill 333, the evidence did not demonstrate that any of the prior offenses by Taliban members benefited the group in a way that was more than reputational, nor did the evidence show that Taliban members collectively engaged in a pattern of criminal activity. We accept that concession. The Attorney General also concedes that substantial evidence does not support Lachan's conviction on the gang offense and the true findings on the gang-related allegations under the law at the time of trial, and therefore Lachan may not be retried on this offense or these allegations.[6]

We determine whether substantial evidence supports a jury's finding "by inquiring whether evidence was presented from which a reasonable trier of fact could conclude,

---

[6] Lachan requested only that the gang enhancements be vacated based on lack of substantial evidence under the law as it existed at the time of trial. However, the Attorney General concedes that the gang offense should also be reversed and the true findings on the gang-related firearm allegations should also be vacated based on insufficient evidence under the law at the time of trial.

16

beyond a reasonable doubt, that the prosecution sustained its burden of proof. [Citation.]" (*People v. Mora and Rangel* (2018) 5 Cal.5th 442, 488.) "Although we assess whether the evidence is inherently credible and of solid value, we must also view the evidence in the light most favorable to the jury verdict and presume the existence of every fact that the jury could reasonably have deduced from that evidence. [Citation.]" (*Ibid.*)

Under the law at the time of Lachan's trial, "[e]xpert opinion that particular criminal conduct benefited a gang by enhancing its reputation for viciousness can be sufficient to raise the inference that the conduct was 'committed for the benefit of . . . a[] criminal street gang' within the meaning of section 186.22(b)(1). [Citations.]" (*People v. Albillar* (2010) 51 Cal.4th 47, 63.) However, "[s]peculative testimony by a gang expert does not constitute substantial evidence to support a gang enhancement. [Citation.]" (*People v. Soriano* (2021) 65 Cal.App.5th 278, 288.)

We accept the Attorney General's concession that substantial evidence does not support Lachan's conviction on the gang offense and the true findings on the gang-related allegations under pre-Assembly Bill 333 law because the evidence did not demonstrate that Lachan committed the charged offenses to benefit a criminal street gang. The robbers generally covered their faces and did not openly advertise themselves as gang members during the charged offenses. Adair, one of the prosecution's gang experts, testified in response to a hypothetical question that gang members who committed armed robbery in concert with each other could use the money to purchase firearms. However, he did not testify that any money from the robberies was actually used by Taliban members to purchase firearms. Adair also testified on cross-examination that a group of gang members committing armed robbery while concealing their identity "wouldn't benefit the Taliban at all if they announced themselves in an area where people weren't familiar with them, because they would have no idea who they were talking about."

17

We likewise accept the Attorney General's concession that substantial evidence does not demonstrate that the offenses were committed "in association with" the Taliban criminal street gang under pre-Assembly Bill 333 law. (§ 186.22, subd. (b)(1), as amended by Stats. 2013, ch. 508, § 2.) The prosecution introduced expert opinion that Lachan, Fitch, Best, Jordan, and Rosales were members of the Taliban street gang.[7] However, the prosecution presented little other evidence to support a conclusion that the group's activities related to their status as gang members. (See *People v. Renteria* (2022) 13 Cal.5th 951, 964 ["Where there is no proof the defendant acted in association with or at the direction of the gang, the prosecution cannot rely on the joint nature of the offense to establish either the requisite benefit to the gang or the specific intent to promote the criminal activity of gang members"].)

Because we accept the Attorney General's concessions that under either pre-Assembly Bill 333 law or the law as amended by Assembly Bill 333, Lachan's conviction for the gang offense must be reversed and the true findings on the gang-related allegations must be vacated, we will reverse Lachan's conviction on the gang offense (count 2) and vacate the section 186.22, subdivision (b) gang allegations associated with numerous counts. We also will vacate the gang-related firearm allegations under section 12022.53, subdivisions (b) and (e)(1). (See *People v. Cooper* (2023) 14 Cal.5th 735, 746 [reversing affirmance of firearm enhancement because "the firearm enhancement alleged under section 12022.53, subdivision (e)(1), is contingent on a true finding on the gang enhancement under section 186.22 . . ."]; *People v. Campbell* (2023) 98 Cal.App.5th 350, 376 ["the amendments Assembly Bill 333 made apply retroactively

---

[7] Prosecution experts were not asked to opine as to whether Steward was a gang member. In cross-examination, Steward denied being a gang member, he stated that to his knowledge, Lachan and Fitch were not gang members, and he said he had "no idea" what the Taliban street gang was. He acknowledged he had a tattoo that said " 'hog status,' " but he denied the tattoo was gang-related. Soares testified that the Taliban was the "enforcement portion of Midtown Hogs."

to the gang-related gun use enhancement under section 12022.53, subdivision (e) . . ."].)
Because we conclude, consistent with the parties' agreement, that substantial evidence
does not support the conviction on the gang offense and the true findings on the gang-
related allegations under the law at the time of Lachan's trial, Lachan may not be retried
concerning these matters. (See *United States v. DiFrancesco* (1980) 449 U.S. 117, 131.)

### C. *Failure to Grant Mistrial—Rap Videos*

Lachan next asserts that his rights to a fair trial under the federal and state
Constitutions were violated when the trial court allowed the prosecution to play two rap
videos in its opening statement, allowed the prosecution to introduce the videos into
evidence and question a gang expert about the videos, allowed the prosecution to refer to
the videos in closing argument, and then denied Lachan's motion for a new trial based on
the use and admission of these videos. Lachan asserts that these videos were
inadmissible under Evidence Code sections 352 and 352.2, that admission of these videos
violated his constitutional rights, and that the errors were not harmless under the standard
outlined in either *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*) or *People v.
Watson* (1956) 46 Cal.2d 818, 836 (*Watson*). The Attorney General argues that the trial
court did not abuse its discretion in allowing the prosecution to introduce and refer to the
videos under Evidence Code section 352, that Evidence Code section 352.2 does not
apply retroactively to Lachan's case, and that any error in admitting the videos was
harmless.

### 1. *Factual background*

In its opening statement, the prosecution played two videos for the jury, one titled
"Hoodie On" and the other titled "A Day in the Life." The prosecutor represented that
the videos depicted members of the Taliban criminal street gang, including brief
appearances by two of the robbery suspects—Best and Rosales. The prosecutor also
stated that one of the videos included a tribute to a deceased gang member that matched a

19

tattoo on Fitch memorializing this same person. The defense's motions in limine did not address these videos, and Lachan raised no objection to the videos at the time they were played.

Following opening statements, however, Fitch's trial counsel objected to the playing of the videos and requested a mistrial, arguing that the videos were "extremely prejudicial." Lachan's counsel joined in the objection, asking for an offer of proof from the prosecutor as to where the videos came from and stating that Lachan did not appear in the videos. The prosecutor responded that both videos had been provided to defense counsel, and that he had told the defense he intended to use the videos. The prosecutor stated he intended to have a prosecution expert testify about the videos, including that two robbery suspects who were identified as Taliban members—Rosales and Best— appeared in the videos.

The trial court denied the defense mistrial motion. The trial court first stated that the fact that the videos appeared to have been commercially produced did not affect their admissibility, and it stated: "These were, apparently, provided to defense counsel ahead of time, and at this point, they have been shown to the jury." The trial court then stated: "In terms of the motion for mistrial, I don't believe that these are so prejudicial that they justify a motion for a mistrial. So the mistrial motion is denied. [¶] With regard to [Evidence Code section] 352, [the prosecutor] has indicated that the expert's going to rely on these things, and they do depict individuals that he believes the expert, I suppose, is going to associate with Taliban. Therefore, I can't say that they are irrelevant, but, you know, if at some point, you think that [the Evidence Code section] 352 motion should be renewed, I don't have a problem with that. Sometimes the evidence that comes in makes that, but at this time, I'm denying the [Evidence Code section] 352 motion without prejudice . . . ."

Adair, one of the prosecution's gang experts, testified about the videos in the prosecution's case-in-chief. At the outset of Adair's testimony about the videos,

20

Lachan's counsel requested a sidebar conference, after which the trial court stated that it overruled an unspecified objection. Adair first testified about the "A Day in the Life" video, stating that he recognized Rosales in the video. Adair testified concerning other individuals in the video that he identified as Taliban members, reasons why a criminal street gang would create and post such a video, gang signs that he observed in the video, and activities such as armed robbery discussed in the video associated with the Taliban. However, Adair did not testify that the video was actually posted anywhere. Adair then testified concerning the "Hoodie On" video. Adair testified that he recognized Best and other Taliban gang members in the video, and that he observed gang signs associated with the Taliban in the video. Following Adair's testimony, the prosecutor stated in a session outside the jury's presence that the videos were relevant because "both videos contained depictions of co-conspirators as it relates to this case, in them, as well as Taliban gang hand signs."

In his closing argument, the prosecutor mentioned the videos, asserting that the Taliban "post their signs and symbols on the Internet," that the videos depicted gang signs and symbols, and that the Taliban "tell you what their primary activities are in their videos, specifically assault with firearms, armed robberies," including discussion of the armed robbery of a specific bank in a video. The prosecutor asserted that the videos "tell you that they respect people that have participated in the Taliban, glorifying people after they passed away, past members after they passed away." Later in his closing argument, the prosecutor contended that evidence demonstrated that Best, who appeared in the "Hoodie On" video, was seen at other times with Lachan and Fitch, including at the Carl's Jr. robbery. The prosecutor also argued that other Taliban members including Rosales appeared in the videos, that Rosales participated in a robbery with Lachan, and that gang signs and symbols that Lachan and Fitch elsewhere displayed were represented in the videos.

21

Fitch's counsel mentioned the rap videos in her closing argument, asserting that Lachan and Fitch did not appear in the videos, stating that the appearances of Best and Rosales in the videos were brief, and questioning what relevance the videos had as to whether Fitch committed the charged offenses. Lachan's counsel also discussed the videos in closing argument, asserting that the "Hoodie On" video did not discuss armed robbery and that Lachan did not appear in the videos. In rebuttal, the prosecutor asserted that the Taliban used the videos to advertise their gang, stating: "They put on social media exactly what they're doing, how they do it. They're telling you that they do armed robberies, that when -- armed robberies with masks is their primary activities. This is -- in the Taliban video going into a Bank of America with their faces covered. They're telling you exactly what they do in their community. This is how it benefits the Taliban."

The jury returned its verdicts in September 2019. On February 3, 2021, Lachan moved for a new trial based in part on the admission of the videos and lyrics, asserting that the videos were unduly prejudicial and should not have been played in the prosecution's opening statement. The prosecution opposed the motion for a new trial, noting that Best and Rosales appeared in the videos and asserting that the videos therefore showed that Lachan and Fitch belonged to and participated in the Taliban criminal street gang.

The trial court denied Lachan's motion for a new trial on February 25, 2021. The trial court stated: "I think that the fact that [the videos] showed persons who were participating in the robberies, not necessarily Mr. Lachan, but other persons with whom Mr. Lachan acted, were in those videos, and the videos were arguably Taliban-related. It then could prove that Mr. Lachan associated with Taliban people in committing those crimes. So I don't think that it was an erroneous ruling to allow those into evidence."

22

## 2. *Legal principles and standard of review*

### a. Evidence Code section 352

Evidence Code section 352 states: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." "Evidence is substantially more prejudicial than probative [citation] if, broadly stated, it poses an intolerable 'risk to the fairness of the proceedings or the reliability of the outcome' [citation]." (*People v. Waidla* (2000) 22 Cal.4th 690, 724.) "In applying this statute we evaluate the 'risk of "*undue*" prejudice, that is, " 'evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues,' " not the prejudice "that naturally flows from relevant, highly probative evidence." ' [Citations.]" (*People v. Salcido* (2008) 44 Cal.4th 93, 148.)

"A trial court's discretionary ruling under Evidence Code section 352 will not be disturbed on appeal absent an abuse of discretion. [Citation.]" (*People v. Lewis* (2001) 26 Cal.4th 334, 372-373 (*Lewis*).) "Under Evidence Code section 352, the trial court enjoys broad discretion in assessing whether the probative value of particular evidence is outweighed by concerns of undue prejudice, confusion or consumption of time. [Citation.]" (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124.) " 'The weighing process under [Evidence Code] section 352 depends upon the trial court's consideration of the unique facts and issues of each case, rather than upon the mechanical application of automatic rules.' [Citation.] The record must affirmatively show that the trial judge did in fact weigh prejudice against probative value, but no more is required. [Citation.] We review the trial court's exercise of discretion in admitting evidence under [Evidence Code] section 352 for abuse and will not disturb the court's ruling 'except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd

manner that resulted in a manifest miscarriage of justice.' [Citation.]" (*People v. Megown* (2018) 28 Cal.App.5th 157, 164.)

" 'Gang evidence is admissible if it is logically relevant to some material issue in the case other than character evidence, is not more prejudicial than probative, and is not cumulative. [Citations.] . . . [¶] However, gang evidence is inadmissible if introduced only to "show a defendant's criminal disposition or bad character as a means of creating an inference the defendant committed the charged offense. [Citations.]" [Citations.] . . . Even if gang evidence is relevant, it may have a highly inflammatory impact on the jury. Thus, "trial courts should carefully scrutinize such evidence before admitting it." ' [Citation.] 'A trial court's admission of evidence, including gang testimony, is reviewed for abuse of discretion.' [Citation.]" (*People v. Coneal* (2019) 41 Cal.App.5th 951, 964 (*Coneal*).)

"When evaluating the admission of rap music, courts have recognized it has 'minimal probative value' to the extent that it 'depend[s] on construing the lyrics as literal statements of fact or intent without a persuasive basis to do so.' [Citations.]" (*People v. Hin* (2025) 17 Cal.5th 401, 477 (*Hin*).) "We have also held that the relevance of rap lyrics is further diminished when they 'lack[] foundation.' [Citation.] These foundational components include whether the defendant authored the lyrics. [Citations.] Thus, '[a]bsent some meaningful method to determine which lyrics represent real versus made up events, or some persuasive basis to construe specific lyrics literally, the probative value of lyrics as evidence of their literal truth is minimal.' [Citation.]" (*Id.* at p. 478.) "We do not mean to suggest that lyrics are never probative of their literal truth. For example, where lyrics are written within a reasonable period of time before or after the charged crime and bear a sufficient level of similarity to the charged crime, their probative value as a statement of fact is increased. [Citations.] It may also be that lyrics with sufficient corroboration from other evidence will have increased probative value.

24

[Citation.]  However, corroborating evidence may also render the lyrics cumulative.”
(*Coneal*, *supra*, 41 Cal.App.5th at p. 969, fn. omitted.)

        b.  <u>Evidence Code section 352.2</u>

Effective January 1, 2023, Assembly Bill No. 2799 (2022-2023 Reg. Sess.) added Evidence Code section 352.2, which “creates specific rules that the trial court must follow in deciding whether to admit evidence of ‘a form of creative expression’ in a criminal trial.” (*People v. Ramos* (2023) 90 Cal.App.5th 578, 590, review granted July 12, 2023, S280073.)  “Evidence Code section 352.2 requires trial judges to consider specific factors before admitting evidence of a form of creative expression—which explicitly includes rap—in a criminal proceeding to avoid injecting racial bias and improper consideration of criminal propensity.” (*People v. Venable* (2023) 88 Cal.App.5th 445, 448, review granted May 17, 2023, S279081, disapproved on another ground in *People v. Aguirre* (2025) 18 Cal.5th 629, 692 (*Aguirre*).)  This statute was added “to address the problem of introducing racial stereotypes and bias into criminal proceedings by allowing rap lyrics into evidence.” (*Venable*, *supra*, at p. 454.)  The legislative intent behind Evidence Code section 352.2 was “to provide a framework by which courts can ensure that the use of an accused person’s creative expression will not be used to introduce stereotypes or activate bias against the defendant, nor as character or propensity evidence; and to recognize that the use of rap lyrics and other creative expression as circumstantial evidence of motive or intent is not a sufficient justification to overcome substantial evidence that the introduction of rap lyrics creates a substantial risk of unfair prejudice.” (Stats. 2022, ch. 973, § 1, subd. (b).)

Subdivision (a) of the Evidence Code section 352.2 states:  “In any criminal proceeding where a party seeks to admit as evidence a form of creative expression, the court, while balancing the probative value of that evidence against the substantial danger of undue prejudice under [Evidence Code] Section 352, shall consider, in addition to the factors listed in [Evidence Code] Section 352, that:  (1) the probative value of such

25

expression for its literal truth or as a truthful narrative is minimal unless that expression is created near in time to the charged crime or crimes, bears a sufficient level of similarity to the charged crime or crimes, or includes factual detail not otherwise publicly available; and (2) undue prejudice includes, but is not limited to, the possibility that the trier of fact will, in violation of [Evidence Code] Section 1101, treat the expression as evidence of the defendant's propensity for violence or general criminal disposition as well as the possibility that the evidence will explicitly or implicitly inject racial bias into the proceedings."[8]

Subdivision (b) of Evidence Code section 352.2 states: "If proffered and relevant to the issues in the case, the court shall consider the following as well as any additional relevant evidence offered by either party: [¶] (1) Credible testimony on the genre of creative expression as to the social or cultural context, rules, conventions, and artistic techniques of the expression. [¶] (2) Experimental or social science research demonstrating that the introduction of a particular type of expression explicitly or implicitly introduces racial bias into the proceedings. [¶] (3) Evidence to rebut such research or testimony." Subdivision (d) of the statute requires the trial court to determine the admissibility of a form of creative expression in limine.

---

[8] "Evidence Code section 1101, subdivision (a) provides that, subject to certain exceptions, 'evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion.' 'Subdivision (b) of [Evidence Code] section 1101 clarifies, however, that this rule does not prohibit admission of evidence of uncharged misconduct when such evidence is relevant to establish some fact other than the person's character or disposition' [citation], with permissible purposes including but not limited to proving 'motive, opportunity, intent, preparation, plan, knowledge, identity, [or] absence of mistake or accident' [citation]." (*People v. Pineda* (2022) 13 Cal.5th 186, 221.) "Moreover, 'to be admissible such evidence . . . "must not contravene other policies limiting admission, such as those contained in Evidence Code section 352." ' [Citation.]" (*Ibid.*)

The California Supreme Court recently held that Evidence Code section 352.2 does not apply retroactively to cases not yet final on appeal. (*Aguirre*, *supra*, 18 Cal.5th at p. 693.) Our Supreme Court held that Evidence Code section 352.2 has "at best an attenuated and inconsistent connection to reduced punishment" and there is "good reason why the Legislature might not have intended for its approach toward the admissibility of creative expressions to apply retroactively," and thus the "inference of retroactive application does not attach to the statute." (*Aguirre*, *supra*, at p. 692, fn. omitted.) However, the court noted that Evidence Code section 352.2, by "provid[ing] additional direction for evaluating the admissibility of creative expressions," sets forth "several factors that [trial courts] *already* might have folded into an evaluation of whether this type of material was admissible under Evidence Code sections 352 and 1101. [Citation.]" (*Aguirre*, *supra*, at p. 692.)

### 3. *Analysis*

While the Supreme Court's decision in *Aguirre* dictates that Evidence Code section 352.2 does not apply retroactively to Lachan's case, we conclude that the trial court abused its discretion under Evidence Code section 352 by permitting the prosecutor to play the videos in his opening statement and by admitting evidence of the videos. We specifically focus our analysis on the "Day in the Life" video, as our review revealed this video had the greater chance of causing undue prejudice. However, we further determine that the error only affected the gang offense and the gang-related allegations that we are already reversing and vacating, and thus the error was harmless.

The probative value of the videos was minimal at best. The prosecutor argued that the videos were relevant both because fellow suspects Best and Rosales appeared in them and because a prosecution expert would testify about the videos to help prove the gang offense and gang-related allegations. The trial court accepted the prosecutor's representations about the videos' probative value in admitting them. However, even accepting these arguments at face value, these arguments indicate the videos had at most

27

minimal probative value. In addition, the prosecution arguments about the videos' probative value largely did not materialize at trial. The videos did not demonstrate that Lachan committed the offenses to benefit a criminal street gang or in association with a street gang; the prosecution presented no evidence that that the videos depicted real events; and the prosecution gang experts' testimony about the videos was minimal and not tied to any showing that Lachan committed the charged crimes to advance the interests of a gang.

Neither Fitch nor Lachan appears in the "A Day in the Life" video. Rosales's appearance in the video lasts approximately one second. Rosales appears by himself, not in conjunction with any other person or with any activities depicted in the video. It is not clear Rosales was aware he would appear in the video or even that he was being recorded. The video depicts no other people the prosecution tied to commission of the charged offenses. While the lyrics of the video briefly refer to the Taliban, the video goes no further to ascribe any particular actions to the gang. Thus, it is not clear how the video is relevant to prove the participation of Fitch or Lachan in the charged offenses, including the gang offense, or the gang-related allegations.

The prosecution also presented no evidence regarding the foundation of either video. No witness testified as to how the videos were produced, or by whom. No witness testified that Lachan was involved in any way in the videos' creation or production or that he was involved in authoring the lyrics. Also, no witness testified as to whether the lyrics represented real or fabricated events. The prosecution's key witness, Stewart, testified that he had not seen either video. Absent any foundation for the videos or any meaningful method to determine which lyrics represent real versus made up events, the videos' probative value was limited. (See *Hin*, *supra*, 17 Cal.5th at p. 477.)

In addition, the prosecution experts' use of both videos to prove the gang offense and the gang-related allegations was limited. Specifically regarding the "A Day in the Life" video, Adair was the only prosecution gang expert who testified about the video.

28

As the Attorney General's brief acknowledges, Adair's testimony was "even shorter" than the video, which was just over three minutes long.

The prosecutor asked Adair, its primary gang expert, for his "opinion about social media and how the Taliban broadcasts its power to the community via social media." Adair testified that posting videos would "establish respect and fear" and that "if I was a rival gang member of the Taliban and I saw videos of Taliban gang members showing videos with high-powered machine guns, robbing other individuals, having money at their expense, and showing a very large propensity toward violence, it would certainly cause me a great deal of concern if I was going to go into that Midtown Menlo Taliban territory." The prosecution also showed Adair a still photo of Rosales from the "A Day in the Life" video, and Adair testified that he recognized Rosales. Adair testified that the phrase "Midtown EPA" depicted in the video is used exclusively by Taliban members. The prosecutor asked Adair why "a street gang [would] want to put on YouTube a video such as this," and Adair responded that such a video could be posted for reasons such as instilling fear, building camaraderie, and gaining popularity. Adair then testified that he saw people in the "A Day in the Life" video displaying hand signs associated with the Taliban and that the video depicted the Taliban's "primary activit[ies]" such as stealing, armed robbery, assault with a firearm, and narcotics sales. Finally, the prosecutor asked Adair: "Does the fact that Joseph Rosales is in this particular video impact your opinion as to whether Joseph Rosales is an active member of the Taliban criminal street gang?" Adair replied "[y]es," without stating what that opinion was. Adair had earlier opined that Rosales was a member of the Taliban. The prosecutor then asked Adair questions about the "Hoodie On" video.

While Adair's testimony describes why the Taliban might want to publish the video, it does not demonstrate that the Taliban did so or that the "A Day in the Life" video had any probative value to prove the case against Lachan, i.e., that it tended to prove that Lachan was a member of the Taliban or committed the charged crimes to

29

advance the interests of the gang. Adair's testimony regarding this video primarily revolved around his opinion that posting such a video on social media would benefit the Taliban. But the prosecution introduced no evidence that the video was posted to social media to enhance the group's reputation. No evidence demonstrated that the video's lyrics or depicted activities represented real events. Adair testified briefly that hand signals in the video were common to the Taliban, but Rosales made no such hand signs, and Fitch and Lachan did not appear in the videos. Adair testified that the video impacted his earlier opinion that Rosales was a Taliban member, but he did not explain how Rosales's brief, solitary appearance in the video supported this opinion. Rosales's one-second appearance in the video does not tend to demonstrate that Lachan committed offenses to benefit a criminal street gang or in association with a criminal street gang. But it did increase the risk that the jury would associate Lachan with Rosales's short appearance in the video, and thus conclude that because he associated with other young men who committed violent crimes, he committed the charged offenses. Given the prejudice inherent in showing the video to the jury, to the extent that the video was probative, its visceral visual impact outweighed its minor contribution to the jury's fact finding.

*Hin* informs our conclusion that the videos lacked probative value. In *Hin*, the California Supreme Court held that the trial court erred in admitting violent rap lyrics found on a compact disc located in the defendant's bedroom because the evidence's admission "created a serious risk that the jury's . . . deliberations would be influenced by racial bias." (*Hin*, *supra*, 17 Cal.5th at p. 481.) In *Hin*, "the prosecution did not argue or introduce any evidence to show that Hin was involved in the creation or production of the song or that it described any of the charged crimes." (*Id*. at p. 479.) The court held: "Indeed, there is no evidence that Hin authored the song, wrote the lyrics, was involved in its production, or even that he listened to it. As the Attorney General concedes, the only connection between Hin and the contents of the song is 'the fact that [Hin]

30

possessed the CD.'  The lack of evidence of Hin's authorship distinguishes this case from others where courts have upheld the admission of rap lyrics under Evidence Code section 452.  [Citations.]"  (*Ibid.*)  The instant case presents an even more attenuated connection between the videos and Lachan as the song in *Hin*.  There was no evidence Lachan was involved in the creation or production of the videos or that they described any of the charged crimes, and there was no evidence Lachan had ever seen or possessed the videos.  In *Hin*, the compact disc of the song was found in Hin's possession; here, even this tenuous connection is absent.

Aguirre* also informs our conclusion that the videos lacked probative value to prove the offenses against Lachan.  In *Aguirre*, the California Supreme Court held that the trial court did not abuse its discretion in admitting evidence of lyrics found in an apartment associated with the defendant over the defendant's Evidence Code section 352 objection.  (*Aguirre*, *supra*, 18 Cal.5th at p. 694.)  Our Supreme Court concluded that the lyrics were "probative of several significant issues at trial," in part because "some the lyrics were relevant to establishing defendant's active participation in the . . . gang at the time of the shooting" and because "[t]he lyrics were not merely cumulative of other evidence regarding defendant's active gang membership."  (*Id.* at pp. 694-695.)  The court noted that the prosecution's gang expert relied on the lyrics in opining that the defendant was an active participant in the gang when the charged crimes occurred.  (*Id.* at p. 695.)  The *Aguirre* court stated that the lyrics "were also probative of issues of motive and intent, including defendant's premeditation and deliberation," in part because "some of the lyrics corresponded with circumstances of the fatal shooting . . . ."  (*Id.* at p. 696.)

Unlike *Aguirre*, where "a substantial foundation was laid that defendant authored the lyrics, and sufficient connections could be drawn between the lyrics and the circumstances of the charged crimes" (*Aguirre*, *supra*, 18 Cal.5th at p. 698, fn. omitted), here no connection was demonstrated between the videos and Lachan, or between the videos and the charged crimes.  No evidence was introduced that Lachan had anything to

31

do with the creation of the videos, and he did not appear in them. Adair only briefly referred to the appearance of hand signals in the videos to establish the existence of the Taliban gang, and Adair did not state that his opinion that Lachan was a Taliban gang member was based on either of the videos. The circumstances in the video did not correspond to the circumstances in the charged offenses except that the "A Day in the Life" video generally depicted use of firearms and apparent robberies. The videos were not probative of motive or intent or any other similar issues. In sum, none of the factors that led the court in *Aguirre* to conclude that the lyrics had probative value are present here.

While the probative value of the "A Day in the Life" video was minimal at best, the risk of undue prejudice was high. The video depicts young men of color committing apparently violent and illegal acts. The video depicts a chalk outline of a body, a man with a hoodie covering his head running away from a bank carrying a satchel, a man approaching a woman with two children on a sidewalk and pressing a handgun to her midsection, two men pointing firearms at a person, and a man with a firearm bursting into a home, along with similar events. It depicts apparent drug and alcohol use and young men displaying amounts of cash. The language of the video is racially charged, including repeated uses of the word the prosecution's transcript characterized as "n***a."

The lyrics in the instant case are akin to those that the California Supreme Court in *Hin* concluded presented a danger of undue prejudice. As in *Hin*, the lyrics here "are graphic and violent," and utilize the word " 'n***a' " repeatedly. (*Hin*, *supra*, 17 Cal.5th at p. 480.) In addition, the instant case utilized not mere lyrics but video images of young men of color engaged in violent conduct, further exacerbating the danger of undue prejudice. As the court stated in *Hin*: "It is precisely because of the risk of injecting racial bias into the jury's decisionmaking that the Legislature passed Evidence Code section 352.2; as noted in the comments to the Assembly floor analysis, ' "rap lyrics and other creative expressions get used as 'racialized character evidence: details or

32

personal traits prosecutors use in insidious ways playing up racial stereotypes to imply guilt.' " ' [Citations.]" (*Ibid.*) While Evidence Code section 352.2 does not apply retroactively here, nothing prohibited the court from incorporating the Evidence Code section 352.2 factors into its Evidence Code section 352 analysis. (*Aguirre, supra,* 18 Cal.5th at p. 692.) The concerns of racial bias that prompted Evidence Code section 352.2 support the conclusion that the danger of undue prejudice here substantially outweighed any marginal probative value the videos offered in support of the prosecution's case.

The trial court's analysis as to whether the two videos should be admitted was brief, merely noting the prosecutor's representations that an expert would "rely on these things," and that the videos "do depict individuals that he believes the expert, I suppose, is going to associate with Taliban" to conclude that "I can't say that they are irrelevant." However, under Evidence Code section 352, the salient question was not whether the videos were irrelevant but whether their probative value was substantially outweighed by the danger of undue prejudice or other concerns. Likewise, the trial court's analysis of the videos' admissibility under Evidence Code section 352 in response to the defense's motion for a new trial was limited, merely noting that the two videos showed Rosales and Best and that the videos "were arguably Taliban-related" that "could prove that Mr. Lachan associated with Taliban people in committing those crimes." The trial court did not articulate the substantial danger of undue prejudice from the videos and whether this danger substantially outweighed any probative value the videos had.

Under the facts of this case, the trial court was required to engage in a more thorough weighing process under Evidence Code section 352. Because of the " 'highly inflammatory' " nature of the "A Day in the Life" video, the trial court was required to " ' "carefully scrutinize such evidence before admitting it." ' " (*Coneal, supra,* 41 Cal.App.5th at p. 964.) "An objection to lyrics as inadmissible under Evidence Code section 352 implicates a highly contextual analysis of their probative value as measured

33

against the threat of undue prejudice that may be associated with their consideration by the trier of fact." (*Aguirre*, *supra*, 18 Cal.5th at p. 694.)

When considering the admissibility of the visual media of a video accompanied by lyrics, the requirement to conduct a thorough weighing analysis under Evidence Code section 352 is even more heightened. The impact of dramatic visual images is undeniable, and trial courts are required to consider that impact in the Evidence Code section 352 balancing test. The trial court articulated no such analysis here, merely stating that the videos were not irrelevant. Further, less prejudicial means were available to obtain similar information. Adair testified that the video depicted activities associated with the Taliban including armed robbery, but Adair presumably could have testified about activities the Taliban engaged in without respect to the video.

Where the videos did not show Fitch or Lachan, where no evidence showed who created or produced the videos, where no evidence showed the Taliban posted the videos anywhere, where Rosales' appearance in the "A Day in the Life" video was isolated and brief, and where the expert's testimony did not tie the videos to the commission of the gang offense or any other charged matter, the probative value of the videos was minimal to none. By contrast, the danger of undue prejudice the "A Day in the Life" video presented was high. By showing a video that depicted acts such as the use of firearms and an apparent depicted bank robbery, the prosecution used the "A Day in the Life" video " 'as literal statements of fact or intent without a persuasive basis to do so.' [Citations.]" (*Hin*, *supra*, 17 Cal.5th at p. 477.) By admitting a video that depicted young men of color engaged in violent activities and that used racially charged language, and by having an expert testify that the video depicted criminal activities associated with the Taliban, the trial court impermissibly risked "inject[ing] racial bias into jury decisionmaking." (*Ibid.*)

Even absent any racial element, the "A Day in the Life" video risked undue prejudice by inviting jurors to improperly speculate that because others in a group

associated with Lachan and Fitch were depicted as committing violent acts, Lachan and Fitch were predisposed to have committed similar acts. The trial court's ruling rested on representations of the videos' probative value that did not materialize at trial. The videos did not demonstrate that Lachan committed the offenses to advance the interests of a criminal street gang; the prosecution presented no evidence tying the videos to real events; and the prosecution gang experts offered little relevant testimony tying the videos to the charged offenses or the gang-related allegations. The trial court did not sufficiently address the danger of undue prejudice the "A Day in the Life" video presented. The trial court thus abused its discretion in admitting this video.

However, we conclude that the error under Evidence Code section 352 was harmless. When evidence is erroneously admitted under state law, the error is reversible if there is a reasonable probability the defendant would have realized a more favorable result had the evidence been excluded. (*Watson*, *supra*, 46 Cal.2d at p. 836.) This standard is applicable in the instant situation. (See *People v. Marks* (2003) 31 Cal.4th 197, 226-227 ["we have held the application of ordinary rules of evidence like Evidence Code section 352 does not implicate the federal Constitution, and thus we review allegations of error under the 'reasonable probability' standard of *Watson* . . ."]; *Coneal*, *supra*, 41 Cal.App.5th at p. 972 [*Watson* standard applicable to erroneous admission of rap videos and lyrics under Evidence Code section 352]; *Hin*, *supra*, 17 Cal.5th at pp. 471, 482 [applying *Watson* standard to conclude that error in admitting evidence of rap videos under Evidence Code section 352 was harmless, and applying the same standard to claim of error under Evidence Code section 352.2].)

Lachan argues that the playing and admission of the videos violated his constitutional due process rights. If Lachan demonstrates that his due process rights were violated, then the *Chapman* standard of prejudice—requiring reversal unless we conclude beyond a reasonable doubt that the error did not contribute to the verdict—is appropriate rather than the *Watson* standard. (See *People v. Albarran* (2007) 149 Cal.App.4th 214,

220.)  The admission of evidence "results in a due process violation only if it makes the trial *fundamentally unfair*.  [Citations.]"  (*People v. Partida* (2005) 37 Cal.4th 428, 439.)

Consistent with the California Supreme Court's recent decision in *Hin*, we conclude that the playing and admission of the videos did not render Lachan's trial fundamentally unfair.  In *Hin*, our Supreme Court held that even though the trial court erred in admitting rap music evidence, the error did not constitute a due process violation that rendered the trial fundamentally unfair.  (*Hin*, *supra*, 17 Cal.5th at p. 482.)  The court reached this conclusion because "the jury heard ample evidence" of the charged non-gang offenses, "including most importantly eyewitness testimony."  (*Ibid.*)  Similarly here, the jury was presented with ample evidence that Lachan committed the non-gang offenses, including eyewitness testimony of a fellow accomplice, DNA evidence connecting Fitch to one of the robberies, videos of the offenses, and cell phone location data and records.  Neither Lachan nor Fitch appeared in the rap music videos.  The trial court instructed the jury that it could consider gang evidence only for limited purposes, and the jury acquitted Lachan on two counts (one count of second degree robbery and one count of felony false imprisonment).  We therefore conclude that the *Watson* standard for harmless error is appropriate here.

Utilizing this standard, it is not reasonably probable that the verdict would have been more favorable to Lachan in the absence of the videos.  Because we are reversing Lachan's conviction on the gang offense and vacating the true findings on the gang-related allegations, the primary impact this evidence would have had is no longer at issue.  The prosecution also used the videos to demonstrate that two other robbery suspects—Best and Rosales—appeared in the videos and that Lachan and Fitch were associated with Best and Rosales.  To the extent that this use was aimed at proving that Lachan committed the other charged offenses, the value of this evidence was greatly outweighed by other evidence proving Lachan committed the remaining charged offenses.

The prosecution played video footage from many of the robberies, and the jury was able to view evidence of the crimes for itself, even though the suspects' identities were largely concealed. Cell phone evidence demonstrated that Lachan gathered with fellow robbery suspects before and after several of the robberies, and this evidence placed Lachan at or near the scene of several of the robberies. DNA evidence consistent with Fitch's profile was found on a sweatshirt left at the scene of one of the robberies. Law enforcement personnel watched Lachan and others enter and leave the scene of the Carl's Jr. robbery, using pole camera video footage and cell phone location data to demonstrate that the group was heading in that direction. Moreover, Steward testified as an eyewitness and fellow perpetrator to several of the robberies and directly implicated Lachan in these offenses, including identifying Lachan's voice in the Carl's Jr. robbery.

We recognize the potential for the video evidence to " 'have a highly inflammatory impact on the jury.' " (*Coneal*, *supra*, 41 Cal.App.5th at p. 964.) However, the prosecutor's discussion of the videos and lyrics in its opening statement and closing argument was limited, and focused mostly on the value of this evidence to prove the gang offense and the gang-related allegations. The remaining evidence against Lachan on the other charged offenses was strong. The trial court also instructed the jury to consider evidence of gang activity only for the limited purposes of deciding whether Lachan acted with the intent, purpose, and knowledge required to prove the gang offense and gang-related allegations. Thus, despite the error under Evidence Code section 352, we conclude it is not reasonably probable that the admission of the two videos affected the jury's remaining verdicts other than count 2 and the gang-related allegations. (See *Watson*, *supra*, 46 Cal.2d at p. 836.)

We have concluded that the trial court's error in admitting the videos did not render Lachan's trial fundamentally unfair and that the error was harmless given our disposition of the gang offense and gang-related allegations. The trial court therefore did not violate Lachan's right to due process by denying the motion for a new trial regarding

37

the admission of these videos. (See Cal. Const. art. VI, § 13 [no new trial shall be granted on the ground of improper admission of evidence unless the error resulted in a miscarriage of justice].)

### D. *Racial Justice Act—Rap Videos*

Lachan next asserts that the playing and admission of the two videos warrants full reversal without a showing of prejudice based on the California Racial Justice Act (RJA), which was enacted effective January 1, 2021. (Stats. 2020, ch. 317.) Lachan argues: "Here, the Government's representative did not personally say the word it transcribed as 'N[***]a' 44 times, but instead relied on the videos to do that. The act of using the gangster rap music videos establishes the [RJA] violation applying the 'objective observer' and 'preponderance of the evidence' standards stated in the statute. [Citation.] Exposing the jury to racial stereotypes of the Black men repeatedly calling out 'N[***]a,' 'shit' 'boy' 'motherfucker,' making drug references, crude sexual references, with accompanying images portraying Black men as armed, violent, and angry, was nothing short of a racist effort to convince the jury that the two men on trial were as inherently dangerous as the fictional Black men portrayed in the videos." Lachan argues that the prosecutor's use of the videos constituted bias or animus toward him as prohibited by section 745, subdivision (a)(2), and that while he is "not required to prove discriminatory purpose" under the RJA, "discriminatory purpose is strongly suggested by the extent to which the prosecution hid its plan to play these videos at trial and when it later argued the videos for the truth of the matter asserted."

Although the RJA was not made effective until January 1, 2021—after the trial proceedings in this case—the Attorney General responds that Lachan forfeited his RJA claim by failing to raise it to the trial court in the motion for a new trial leading up to the June 2021 judgment. The Attorney General also asserts that the claim fails on the merits.

38

Lachan responds by asserting that he received ineffective assistance of counsel if this issue is considered forfeited.

We conclude that Lachan has established a prima facie case of an RJA violation. We therefore remand this case to the trial court to conduct a hearing under the RJA, and if the court finds by a preponderance of the evidence that an RJA violation has occurred, to impose a remedy specific to the violation.

### 1. *Legal principles and standard of review*

The RJA was enacted "to eliminate racial bias from California's criminal justice system because racism in any form or amount, at any stage of a criminal trial, is intolerable, inimical to a fair criminal justice system, is a miscarriage of justice under Article VI of the California Constitution, and violates the laws and Constitution of the State of California." (Stats. 2020, ch. 317, § 2, subd. (i).) An RJA violation occurs when an attorney in the case "exhibited bias or animus towards the defendant because of the defendant's race, ethnicity, or national origin," among other circumstances. (§ 745, subd. (a)(1).)

A defendant may file a motion alleging an RJA violation in a court of competent jurisdiction. (§ 745, subd. (b).) "For claims based on the trial record, a defendant may raise a claim alleging a violation of subdivision (a) on direct appeal from the conviction or sentence." (*Ibid.*)

A "central premise" of the RJA is "that bias can be unconscious and implied as well as conscious and express." (*Bonds v. Superior Court* (2024) 99 Cal.App.5th 821, 824.) "[T]he Racial Justice Act was enacted to address much more than purposeful discrimination based on race. Indeed, the primary motivation for the legislation was the failure of the judicial system to afford meaningful relief to victims of unintentional but *implicit* bias." (Id. at p. 828.) Thus, an RJA violation occurs where an attorney in the case exhibited racial bias or animus, "whether or not purposeful." (§ 745, subd. (a)(2).)

39

If a defendant files a motion in the trial court and makes a prima facie showing of an RJA violation, the trial court is required to hold a hearing. (§ 745, subd. (c).) " 'Prima facie showing' means that the defendant produces facts that, if true, establish that there is a substantial likelihood that a violation of subdivision (a) occurred." (*Id.*, subd. (h)(2).) "Under the Racial Justice Act, the court does not ask if the defendant proffered facts sufficient to demonstrate actual entitlement to relief. Rather, the court asks if a defendant has proffered facts sufficient to show a 'substantial likelihood'—defined as 'more than a mere possibility, but less than a standard of more likely than not'—that the Racial Justice Act has been violated. [Citation.] The prima facie threshold is thus lower than the preponderance of the evidence standard required to establish an actual violation of the Racial Justice Act. [Citation.]" (*Finley v. Superior Court* (2023) 95 Cal.App.5th 12, 22.) "The court should accept the truth of the defendant's allegations . . . unless the allegations are conclusory, unsupported by the evidence presented in support of the claim, or demonstrably contradicted by the court's own records. [Citation.] And . . . the court should not make credibility determinations at the prima facie stage." (*Id.* at p. 23, fn. omitted.)

If a prima facie case is established, the trial court shall hold a hearing, at which "[t]he defendant shall have the burden of proving a violation of subdivision (a) by a preponderance of the evidence." (§ 745, subd. (c)(2).) "The defendant does not need to prove intentional discrimination." (*Ibid.*) "[I]f the court finds, by a preponderance of evidence, a violation of subdivision (a), the court shall impose a remedy specific to the violation" from a list of remedies the RJA outlines. (*Id.*, subd. (e).) No "traditional case-specific harmless error analysis" is performed under the RJA, and "[t]he plain language of the statute . . . mandates that a remedy be imposed without requiring a show of prejudice." (*People v. Simmons* (2023) 96 Cal.App.5th 323, 337.)

## 2. *Analysis*

We conclude that Lachan has established a prima facie case that the prosecution's playing and use of the rap music videos—particularly the "A Day in the Life" video—constituted racial bias or animus in violation of the RJA. While a trial court can make such a determination based on an RJA motion presented to the trial court, we are able to make the prima facie determination concerning Lachan's RJA issue here consistent with general principles of appellate review.

The Attorney General argues that Lachan forfeited his claim of an RJA violation by failing to raise it to the trial court, because the RJA was enacted effective January 1, 2021, and Lachan's judgment was not entered until June 2021. Most Court of Appeal opinions have held that RJA claims are subject to the general appellate rules of forfeiture, despite the language in section 745, subdivision (b) allowing defendants to raise RJA claims on direct appeal that are "based on the trial record." (See *People v. Lashon* (2024) 98 Cal.App.5th 804, 811-813; *People v. Singh* (2024) 103 Cal.App.5th 76, 113; *People v. Corbi* (2024) 106 Cal.App.5th 25, 41; *People v. Quintero* (2024) 107 Cal.App.5th 1060, 1077 (*Quintero*); *People v. Wagstaff* (2025) 111 Cal.App.5th 1207, 1219.)

However, Lachan argues that if the RJA issue is considered forfeited, he received ineffective assistance of counsel. "To establish constitutionally inadequate representation, a defendant must demonstrate that (1) counsel's representation was deficient, i.e., it fell below an objective standard of reasonableness under prevailing professional norms; and (2) counsel's representation subjected the defendant to prejudice, i.e., there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to the defendant. [Citations.]" (*People v. Samayoa* (1997) 15 Cal.4th 795, 845 (*Samayoa*).) To forestall Lachan's claim of ineffective assistance of counsel, we exercise our discretion to reach the merits of Lachan's RJA claim. (See *People v. Torres* (2025) 113 Cal.App.5th 88, 92 [reviewing court may reach forfeited claim where ineffective assistance of counsel claimed]; *Quintero*, *supra*, 107 Cal.App.5th

41

at p. 1074 [addressing merits of forfeited RJA claim because defendant alleged he received ineffective assistance of counsel by failing to object].) This approach is particularly appropriate here, where we can discern no rational tactical reason for Lachan's counsel not raising the RJA issue when counsel already filed a motion for a new trial concerning the playing and use of the rap music videos.

Lachan's claim on appeal proffers facts sufficient to show a substantial likelihood of an RJA violation at trial. The burden at the prima facie stage under the RJA is low. As we have discussed, *ante*, Lachan has proffered facts that the prosecutor played and introduced two rap music videos that had little to no relevance to this case, even considering the gang offense and the gang-related allegations under the law as it existed at the time of trial. The prosecutor's stated purposes for playing and introducing the videos were largely not realized during the trial. The "A Day in the Life" video in particular contained a strong racial component in its language and depiction of young men of color committing acts of violence accompanied by racially charged language. Although the Supreme Court has determined that Evidence Code section 352.2 does not apply retroactively, the danger of racial discrimination is precisely the reason the Legislature limited the use of rap music evidence in the statute. The Legislature cited "a substantial body of research show[ing] a significant risk for unfair prejudice when rap lyrics are introduced into evidence." (Stats. 2022, ch. 973, § 1, subd. (a).) Apart from the concerns that led to the enactment of Evidence Code section 352.2, the California Supreme Court has recognized that evidence of rap music carries particular concerns of racial bias in criminal trials. "[T]he introduction of rap lyrics into evidence 'invokes racist stereotypes about the inherent criminality of young black and Latino men' and injects racial bias into jury decisionmaking. [Citation.]" (*Hin*, *supra*, 17 Cal.5th at p. 477.)

The Attorney General appears to argue that an RJA violation cannot have occurred because the prosecutor did not use or repeat the words spoken in the video, and because the videos were relevant to issues at trial.

The fact that the prosecutor did not utter the words in the video does not foreclose an RJA claim. The RJA expressly includes in its description of qualifying acts an attorney using racially discriminatory language, but it also includes an attorney "otherwise exhibit[ing] bias or animus towards the defendant because of the defendant's race, ethnicity, or national origin, whether or not purposeful." (§ 745, subd. (a)(2).) The RJA does not define "racial bias or animus," but it specifies that the moving party is not required to prove "intentional discrimination." (*Id.*, subd. (c)(2).) Indeed, the statement of Legislative intent behind the RJA's enactment states that the act was aimed at addressing "the *use* of racially incendiary or racially coded language, images, and racial stereotypes in criminal trials." (Stats. 2020, ch. 317, § 2, subd. (e), italics added.) The Legislature has recently stated that the RJA's provisions should be interpreted in the light of requiring "bold, concerted, and ongoing efforts to undo" "centuries of historical and embedded racial injustice . . . ." (Assembly Bill No. 1071 (2025-2026 Reg. Sess.) § 1, subd. (f).) Interpreted in light of the RJA's broad purpose, we conclude that the RJA applies where the prosecution offers racially incendiary evidence, even if the prosecution did not create the images or repeat the words expressed in the medium.

Moreover, because we have concluded that the videos had little to no probative value in this case, we need not decide whether the prosecution can violate the RJA when it introduces racially-charged evidence that is directly relevant to an issue at trial. The Attorney General asserts that no RJA violation has occurred because under section 745, subdivision (a)(2), an RJA violation does not exist "if the person speaking is relating language used by another that is relevant to the case . . . ." However, as we explain above, the rap music videos here had little to no relevance in this case, and thus this exception does not foreclose the substantial likelihood of an RJA violation. In addition, a

substantial likelihood exists that the prosecution did more than "relat[e] language used by another that is relevant to [this] case." (*Ibid.*) By playing videos that included racially charged images and language, by having an expert testify about the videos, and by using the videos in argument, a substantial likelihood exists that the prosecution went beyond the narrow exception in the RJA for relating language used by another that is relevant to the case.

At the prima facie stage, Lachan need not prove that the prosecutor violated the RJA. He merely needs to proffer facts sufficient to show a *substantial likelihood* that the prosecution exhibited racial bias or animus. Unlike our analysis of the videos under Evidence Code section 352, the conclusion that the playing and admission of the videos did not affect the non-gang offenses does not foreclose an RJA violation. Lachan also does not need to demonstrate that the prosecutor intended to discriminate against him to establish a prima facie case. The Legislature has recently "reassert[ed] the low threshold required to establish a prima facie showing" under the RJA. (Assembly Bill No. 1071 (2025-2026 Reg. Sess.) § 1, subd. (c).) Based on the lack of probative value the videos had, the danger of racial bias that the "A Day in the Life" video particularly presented, and the manner in which the prosecutor used the videos at trial, we conclude that Lachan has "satisfied his initial minimal burden to produce facts that, if true, establish that there is more than a mere possibility of an RJA violation." (*People v. Howard* (2024) 104 Cal.App.5th 625, 656 (*Howard*).)

While the trial court can make a prima facie determination after an RJA motion is presented (§ 745, subd. (c)(2)), this court is able to make the prima facie determination here consistent with general appellate principles, as we review de novo the question of whether a prima facie case of an RJA violation has occurred. (*Howard*, *supra*, 104

44

Cal.App.5th at p. 650.)  The question of whether an RJA violation is proved, however, is appropriately left to the trial court to resolve in the first instance following a hearing.[9]

On remand, we will direct the trial court to conduct a hearing to evaluate Lachan's RJA claim under section 745, subdivision (c).  At this hearing, Lachan will bear the burden of proving an RJA violation by a preponderance of the evidence.  (*Id.*, subd. (c)(2).)  If the trial court finds by a preponderance of the evidence that an RJA violation has occurred, it "shall impose a remedy specific to the violation," consistent with section 745, subdivision (e).

### E. *State's Claim of Privilege—Stingray Device*

Lachan next argues that he was denied due process under the Fourteenth Amendment to the United States Constitution when the trial court sustained the state's claims of privilege under Evidence Code section 1040 concerning whether law enforcement conducted a warrantless "Stingray" search in its investigation into the charged offenses.  Lachan argues that he established a prima facie case for an in camera review of evidence concerning whether law enforcement utilized a Stingray device, and that the trial court failed to use the procedure outlined in Evidence Code section 1040, instead relying on the state's offer of proof concerning whether a Stingray device was used.  We discern no error in the trial court's resolution of this issue.

#### 1.  *Factual background*

The prosecution called in its case-in-chief Michael Drago, a San Jose Police Department sergeant who served as a robbery detective during the investigation into the charged offenses.  Drago testified that he analyzed cell phone data regarding Lachan, Fitch, and other suspects, and that law enforcement obtained a pen register warrant for a

---

[9] At this hearing, the trial court may consider in the first instance, among any other matters, Lachan's assertion that the videos were not provided to defense counsel before they were played in the prosecution's opening statement, to the extent this matter is relevant to Lachan's RJA claim and recognizing that proving intentional discrimination is not required to establish an RJA violation.  We express no opinion on this issue.

phone number associated with Fitch. This pen register allowed investigators to monitor information about ingoing and outgoing calls in real time, including obtaining location data based on cell towers. Drago further testified concerning actions he and other detectives took to determine that Fitch's phone and the phones of other suspects were located at or near several of the robberies committed to that point.

Drago testified that on June 30, 2015, he observed the live feed of a camera installed on a pole outside a residence in Newark associated with Fitch and saw Fitch, Lachan, Best, and Jordan get into a vehicle. He testified that he monitored cell phone activity for the suspects, which showed them moving from the residence toward San Jose, eventually stopping in Watsonville. Drago testified that he could not pinpoint the exact location at which the phones stopped because he received "very large pings," but that as he and other officers drove toward Watsonville, he communicated with other officers who were able to spot Fitch, Lachan, and the other suspects. Other witnesses testified that during this occasion in Watsonville, Lachan, Fitch, and the others in the group committed a robbery of a Carl's Jr. restaurant while law enforcement officers observed them.

On cross-examination, Lachan's counsel asked Drago: "Is there a device known as a Stingray that was utilized in this investigation?" Drago asserted a privilege under Evidence Code sections 1040 and 1042, stating: "Because it's a law enforcement tool I cannot discuss in open court." Lachan's trial counsel again asked: "Are you able to tell us, detective, whether or not, on June 30th, 2015, that the Stingray device was in use?" Drago replied: "Same answer."

Lachan's counsel then requested and received a hearing outside the jury's presence, at which Lachan's counsel stated: "[I]t's my understanding that the use of this device, that I believe the courts have deemed to be unconstitutional invasion of privacy [*sic*]. . . . [¶] And I would ask that a recess be declared and allow counsel to provide more information to the court as to its use, it[]s constitutionality, and how it was utilized

46

in this particular case." The trial court asked some clarifying questions, including whether Lachan's counsel believed the Stingray device was used to simulate a cell tower against which a suspect's phone pinged, and Lachan's counsel responded that it was reasonable to assume this was so based on Drago's assertion of a privilege. The trial court questioned whether it could be assumed that a Stingray device was used based on Drago's assertion of a privilege, and the prosecutor also stated that he would like to see authority to support Lachan's counsel's assertion that use of a Stingray device was unconstitutional. Lachan's counsel agreed to provide his research to the prosecutor, and the parties and the trial court agreed to take up the matter the following day. The cross-examination of Drago proceeded concerning different subjects.

The following day, the trial court put on the record a discussion concerning the Stingray issue. The prosecutor stated that he had talked to another San Jose police officer, Enrique Hernandez, stating: "I asked Detective Hernandez if . . . San Jose Police Robbery Unit had access to a Stingray or cell site simulator. He indicated to me that San Jose Robbery does not have access to a Stingray or cell site simulator. [¶] He indicated San Jose Robbery Unit does not have either device, and then he indicated to me that he did not use either of those devices in this investigation. [¶] I then called Detective Drago on the phone and I asked him the same question. He indicated the same response to me, that San Jose Robbery does not have access to a Stingray or cell site simulator; that he did not use a Stingray or cell site simulator in this case."[10]

The trial court then asked: "And does anybody want Detective Hernandez to take the stand and testify to that, or are you satisfied with the offer of proof at this point?" After further discussion, the court stated: "[T]he court's tentative ruling is to deny

---

[10] The reporter's transcript states that Lachan's counsel made these statements representing conversations with Hernandez and Drago, not the prosecutor. However, the context of this statement indicates that it was the prosecutor who made these statements. Both parties' briefs thus treat these statements as having been made by the prosecutor.

disclosure, further disclosure regarding questions regarding it without prejudice. [¶] So the question that I have is whether or not the offer of proof, which is part of the basis of my ruling, is acceptable, or whether you want to have the officer testify to that." Lachan's counsel responded: "As to the specifics of the offer of proof, no." The trial court followed up: "This offer of proof that San Jose did not use or have access to it and did not use Stingray device or other cell site simulator in this investigation. And the question is are you -- accept that, [the prosecutor's] statement, that that's what the witness is going to say, or do you not accept that and you want the witness to testify?" Lachan's counsel responded: "I'm accepting it," then stating: "We're satisfied to that degree." Again, the trial court asked Lachan's counsel whether he was satisfied that "Detective Hernandez would testify that neither device was accessed by San Jose. They didn't have it and they didn't use it." Lachan's counsel replied affirmatively.

The trial court then ruled that based on Lachan's counsel's acceptance of the offer of proof, the defense could not further inquire into whether a Stingray device was used in the investigation. The trial court stated that its ruling would be the same whether based on Evidence Code section 352 or Evidence Code section 1040, stating that the court did not "see it has any probative value in this case." The trial court stated that either party could revisit the issue if any information about the police department's possession or use of a Stingray device came to light, and that even if a Stingray device was used it was authorized by an existing search warrant.

Lachan's counsel then asserted that the use of a Stingray device would not be covered by the warrant, and counsel then asked whether "it would be possible for Detective Drago either to write a report or a declaration stating what the court -- what he said about the Stingray not being used by the Robbery Unit, and then put it under seal if he's concerned about the privacy or disclosure." The trial court asked Lachan's counsel whether he was withdrawing his agreement to the offer of proof, and Lachan's counsel replied "[n]o" while repeating his request for a written assurance from Drago that the

48

police department did not have access to a Stingray device or use it in this investigation. The trial court then stated that it would not require anything further from Drago or Hernandez because Lachan's counsel accepted the offer of proof, and it stated that if the defense wanted to reopen this issue, it would need to comply with the requirements set forth in *People v. Montgomery* (1988) 205 Cal.App.3d 1011 (*Montgomery*).

More than a month later, after both parties had rested their cases, Lachan's counsel re-raised the issue regarding the Stingray device. Lachan's counsel stated that the defense had found a news outlet release stating that the San Jose Police Department had purchased a Stingray device and had been trained on its use. Lachan's counsel stated that the news outlet from which the release came might have existed in 2013, indicating that the release was dated in 2013. Lachan's counsel stated: "I have to assume that with proper protocol being followed, that it could have been employed in this investigation." Lachan's counsel noted the offer of proof that was earlier made, disputed the trial court's earlier conclusion that use of a Stingray device would be authorized under an existing warrant, and stated as follows: "And the only thing I can suggest is that at some point, if there's further investigation along these lines, it may be grounds for some either new trial motion or basis for some appeal. How that's going to happen is beyond my level of expertise at this point, and I'm not sure anybody else would know." After the prosecutor noted that the trial court's earlier ruling was based on the accepted offer of proof, Lachan's counsel stated: "So does an offer of proof, as it was presented by the district attorney, satisfy -- Your Honor asked us this, 'Do you accept that offer of proof?' and at that time, we had -- we were somewhat between a rock and a hard place, and accepted it, but I'm not sure it met all the legal requirements of an offer of proof, and I just submit on those points."

The trial court responded that defense counsel had accepted the offer of proof, had not earlier sought to withdraw its acceptance of the offer of proof, and had presented no information that contradicted the positions of Hernandez and Drago set forth in the offer

of proof.  The trial court denied the request, noting that more than a month had passed since this issue was raised and defense counsel had not sought any investigation into this matter.

More than a year later, after the verdicts in this matter, Lachan filed a *Marsden*[11] motion to discharge his appointed counsel.  Lachan generally asserted that his counsel failed to communicate with him, additionally asserting that his trial counsel should have investigated the Stingray issue further and filed a motion on this issue during the trial.  Lachan's trial counsel stated that he had been surprised to learn of the news release that the department had purchased a Stingray device, and he stated as follows:  "I believe that it would take further intense investigation, and I'm not sure how far we can get, because the police agency signs a non-disclosure agreement as to whether or not they have access to a Stingray and whether it was used.  There's no question that it would have been a very significant piece of evidence that -- the location of Mr. Lachan and his co-defendants as they traveled from location to location."  The trial court denied the *Marsden* motion, noting that defense counsel could have investigated this matter if he chose to, but "given the statements that were made that it was not used in the case, it's unlikely that that would have had an impact on the case."

Lachan then filed a motion for new trial.  The motion for a new trial asserted that the use of a Stingray device was not covered by a warrant, and thus "the trial court should have called for a hearing on a Motion to Suppress Evidence under these circumstances."  At a hearing on the motion for a new trial, Lachan's counsel asserted that "we at least should have been given the opportunity to conduct . . . an evidentiary hearing . . . where, under oath, one of the detectives, Drago, could respond to specific questions regarding the circumstances surrounding the acquisition of the Stingray by San Jose PD."

---

[11] *People v. Marsden* (1970) 2 Cal.3d 118.

50

In response, the prosecutor noted that Lachan's trial counsel accepted the offer of proof when Hernandez could have testified concerning the lack of a Stingray device in this investigation, and the prosecutor asserted that ample evidence demonstrated the location of cell phones for Lachan and Fitch during the robberies including the Carl's Jr. robbery. The trial court denied the motion for a new trial concerning this issue, noting that defense counsel accepted the offer of proof on this issue and stating that "there was never really any evidence of any kind that was put up to show that a Stingray was used on this case."

## 2. *Legal principles and standard of review*

Evidence Code section 1040 states in relevant part: "A public entity has a privilege to refuse to disclose official information, and to prevent another from disclosing official information, if the privilege is claimed by a person authorized by the public entity to do so" if "[d]isclosure of the information is against the public interest because there is a necessity for preserving the confidentiality of the information that outweighs the necessity for disclosure in the interest of justice . . . ." (*Id.*, subd. (b), (b)(2).) Evidence Code section 1042 states that "if a claim of privilege under this article by the state or a public entity in this state is sustained in a criminal proceeding, the presiding officer shall make such order or finding of fact adverse to the public entity bringing the proceeding as is required by law upon any issue in the proceeding to which the privileged information is material." (*Id.*, subd. (a).)

In *Montgomery*, the Court of Appeal held that "the trial court erred under Evidence Code section 1042 when, without a proper hearing, it refused to strike portions of the testimony of a witness for the prosecution after the court upheld the witness's assertion of the surveillance-location privilege under [Evidence Code] section 1040." (*Montgomery*, *supra*, 205 Cal.App.3d at p. 1014, fn. omitted.) That case involved a claim by a law enforcement officer that his surveillance location during a drug transaction involving the defendant was confidential and privileged. (*Id.* at pp. 1015-1016.) The

51

Court of Appeal held that "error occurred in the manner in which the court proceeded and that the conviction for sale of marijuana cannot stand without a proper determination of the issue raised under [Evidence Code] sections 1040 and 1042." (*Id.* at p. 1017.) The reviewing court stated: "The correct procedure in these cases is for the court first to ask the defendant to make a prima facie showing for disclosure. [Citations.] If defendant does so, the court should then proceed under [Evidence Code] section 915 and hold an in camera hearing attended by the party claiming the privilege . . . . The defendant should be given an opportunity to propose questions to be asked at this hearing. The in camera hearing is a preliminary inquiry into whether the claim of privilege should be upheld. If the People succeed in camera, the adversary process should be utilized, 'probing the information's relevance to the defense, exploring with counsel the availability of other alternatives, and, if necessary, hearing testimony *voir dire*.' [Citation.] The hearing should conclude with the trial court making findings sufficient to enable the appellate court to review its decision. [Citation.]" (*Id.* at p. 1021, fns. omitted.)

"A trial court has discretion to deny disclosure not only when the necessity for confidentiality outweighs the necessity for disclosure, but also 'when there is an " 'absence of a showing which specifies the material sought and furnishes a "plausible justification" for inspection [citations].' " ' [Citation.] The trial court's ruling is reviewed under the abuse of discretion standard. [Citation.]" (*People v. Suff* (2014) 58 Cal.4th 1013, 1059.) Likewise, rulings made under Evidence Code section 352 are reviewed for an abuse of discretion. (*Lewis*, *supra*, 26 Cal.4th at pp. 372-373.)

### 3. *Analysis*

We find no abuse of discretion in the trial court's resolution of this issue. Drago initially claimed a privilege in response to the question of whether a Stingray device was used in this investigation. However, the next day the prosecutor provided an offer of proof that both Drago and Hernandez would testify that the police department did not have a Stingray device or use such a device in the investigation into the charged offenses.

52

Lachan's defense counsel accepted the prosecutor's offer of proof, with the trial court repeatedly leaving the matter up to Lachan's counsel and Lachan's counsel repeatedly affirming that he accepted the offer of proof. The acceptance of the offer of proof meant that Lachan did not establish a prima facie case for disclosure. The trial court was not required to follow the procedures outlined in *Montgomery*, including holding an in camera hearing, when Lachan's counsel accepted that Drago and Hernandez would, in fact, answer the questions put to them about a Stingray device in the negative. The trial court offered the defense the choice between accepting the offer of proof or questioning Drago and Hernandez about this matter, and the defense chose to accept the offer of proof.

Once the defense accepted the offer of proof on this matter, the question presented to the trial court became whether this line of questioning was relevant and whether questioning regarding this matter should be permitted under Evidence Code section 352. Because the trial court was presented with an accepted offer of proof that two witnesses with knowledge would testify that the police department did not have or use a Stingray device, and because Lachan's counsel articulated no basis to believe that investigators had access to or used a Stingray device in this matter, the trial court reasonably concluded that the issue of the Stingray device was "an exercise in irrelevance."

Lachan argues that the prosecutor's offer of proof was "carefully worded" to state that Drago and Hernandez would testify that "they personally 'did not use' a Stingray and 'the San Jose robbery unit does not have' one." Lachan asserts that the issue was not forfeited because Lachan's counsel argued that other officers or another division within the police department might have used such a device. However, if the prosecutor's offer of proof was too narrowly worded to satisfy the defense, then the defense did not need to accept it and could have instead questioned Drago and Hernandez about any remaining matters not addressed by the offer of proof. The trial court offered to have Hernandez testify concerning the Stingray device, and Lachan's counsel instead repeatedly stated

53

that he accepted the offer of proof on this matter.  Even after the trial court stated that its tentative ruling based on the accepted offer of proof was to prohibit further questioning on this subject, Lachan's counsel again accepted the offer of proof.  The defense's acceptance of the offer of proof supported the trial court's ruling on this matter.

The news release stating that the police department had purchased and been trained on a Stingray device does not change the analysis of this issue.  Even assuming that this news release provided reason to believe that the police department had purchased a Stingray device by 2013—about two years before the investigation in this matter—this does not demonstrate that the police department still had the device at the time of the investigation, that the robbery unit had access to this device, or that such a device was used in the investigation into this case.  Lachan's counsel asked for some type of investigation into this matter, but offered no specifics as to what this investigation should entail.  As the trial court noted, the defense had the ability to investigate this matter over the course of more than a month following the accepted offer of proof, and the defense did not do so.  Given the passage of time, the trial court reasonably concluded that a continuance of unknown duration to provide for some unspecified investigation into this matter was not warranted.  The news release supplied limited information compared to the accepted offer of proof.  The defense did not seek to withdraw its acceptance of the offer of proof despite the discovery of the news release.  Therefore, we conclude that the trial court did not abuse its discretion by declining to revisit this issue, delay the trial, and potentially reopen the case to permit questioning on this issue.

## F. *Ineffective Assistance of Counsel—Prosecutorial Misconduct*

Lachan asserts that he received ineffective assistance of counsel when his trial counsel failed to object to prosecutorial misconduct and seek remedies from the trial court to address the misconduct.  Specifically, he asserts that the prosecutor committed misconduct in two respects:  (1) "the prosecution elicited opinions that specific residents

of East Palo Alto and Menlo Park were 'validated' and 'documented' gang members based on inadmissible gang data[]base evidence which in 2018 had been placed under a statewide moratorium by the legislature because police data[]bases contained inaccurate and unreliable information about gangs and gang membership"; and (2) "the prosecution elicited and failed to correct its gang expert's false testimony that there were 'laws' governing 'debriefing' with police." The Attorney General responds that Lachan did not receive ineffective assistance of counsel because the complained-of actions by the prosecutor did not constitute misconduct, and because Lachan was not prejudiced by any error.

### 1. *Factual background*

Before trial, the defense moved in limine to exclude and/or limit gang evidence in several respects, but the motion in limine did not specifically object to the use of the terms "validated" or "documented." In the prosecution's case-in-chief, as the prosecutor questioned Adair about his credentials as a gang expert, Adair testified that part of his duties as a Menlo Park police officer were "to validate new gang members, track what gang activity is happening, who's involved." During voir dire of Adair, Fitch's trial counsel asked Adair to explain "how you dealt with validating gang members." Adair listed a set of 22 criteria that the San Mateo County Sheriff's Office Gang Task Force used to validate gang members.

During the prosecution's case-in-chief, Adair testified as to the "validated" or "documented" status of Taliban gang members, including Lachan. Later, however, Lachan's trial counsel successfully objected to Adair's testimony that Lachan and Fitch were "validated members of the Taliban criminal street gang," with the objection focused on the word "validated." No objection was made to Adair's testimony that other individuals were "validated" or "documented" members of the gang. Adair also testified that his opinion was that Fitch was an "active" member of the Taliban criminal street gang. Adair did not specifically testify that Lachan was an "active" member of the gang.

55

However, the prosecutor did ask Adair whether Lachan's prior convictions were relevant to Adair's opinion as to whether Lachan was "an active member of the Taliban criminal street gang."

During preliminary questioning of Adair to establish his credentials as a gang expert, the prosecutor asked Adair about training he had received concerning gangs, and the prosecutor asked specifically about training he received from persons convicted of crimes that addressed debriefing of gang members. Adair responded: "I'm certain that the laws that apply to debriefing and--the rules that apply to debriefing differ from state to state, possibly even county to county, and I'm not really aware of what they had to or didn't have to go through. I know that the process itself for these individuals to come and teach is fairly confidential, you know. I know they come in with armed, you know, protection, don't make it known to the public that they're going to be teaching there. So I don't know the entire process of how they get to become an instructor at one of these courses." Neither defense counsel objected to this testimony.

## 2. *Legal principles and standard of review*

Effective January 1, 2018—before Lachan's trial—section 186.36 was added to the Penal Code to limit use of the "CalGang" database, including requiring the Department of Justice "to promulgate regulations governing the use, operation, and oversight of any shared gang database, including, among other things, establishing the requirements for entering and reviewing gang designations, the retention period for listed gangs, and the criteria for identifying gang members." (Stats. 2017, ch. 695.)

"To establish constitutionally inadequate representation, a defendant must demonstrate that (1) counsel's representation was deficient, i.e., it fell below an objective standard of reasonableness under prevailing professional norms; and (2) counsel's representation subjected the defendant to prejudice, i.e., there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to the defendant. [Citations.]" (*Samayoa*, *supra*, 15 Cal.4th at p. 845.) "[R]arely will an

appellate record establish ineffective assistance of counsel." (*People v. Thompson* (2010) 49 Cal.4th 79, 122.) " 'When a defendant on appeal makes a claim that his counsel was ineffective, the appellate court must consider whether the record contains any explanation for the challenged aspects of representation provided by counsel. "If the record sheds no light on why counsel acted or failed to act in the manner challenged, 'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation,' [citation], the contention must be rejected." ' [Citations.]" (*Samayoa*, *supra*, at pp. 845-846.) "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." (*Strickland v. Washington* (1984) 466 U.S. 668, 697.)

" ' "A prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct 'so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process.' " ' [Citations.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves ' " 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' " ' [Citation.] As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion--and on the same ground--the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety. [Citation.] Additionally, when the claim focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion. [Citation.]" (*Samayoa*, *supra*, 15 Cal.4th at p. 841.) " 'It is, of course, misconduct for a prosecutor to "intentionally elicit inadmissible testimony." [Citations.]' [Citations.]" (*People v. Smithey* (1999) 20 Cal.4th 936, 960.)

"[T]o preserve a claim of prosecutorial misconduct for appeal, ' " 'a criminal defendant must make a timely and specific objection and ask the trial court to admonish

the jury to disregard the impropriety.' " [Citation.] The lack of a timely objection and request for admonition will be excused only if either would have been futile or if an admonition would not have cured the harm.' [Citation.]" (*People v. Hoyt* (2020) 8 Cal.5th 892, 942-943.)

### 3. *Analysis*

Lachan has not established that he has received ineffective assistance of counsel, either because his trial counsel failed to object to testimony regarding the "validated" or "documented" gang status of certain people, or because his trial counsel failed to object to Adair's testimony that "laws" and "rules" apply to debriefing. Even assuming that the prosecutor's questioning on these topics amounted to misconduct to which defense counsel should have objected, and even assuming that Lachan's trial counsel's performance was deficient in failing to object, Lachan was not prejudiced by any error.

We have determined that the substantive gang offense must be reversed and the gang-related allegations must be vacated. This removes any possible prejudice to Lachan on either alleged basis for objection at trial. The testimony Lachan cites in this issue solely concerned the substantive gang offense and the gang-related allegations, not the remaining offenses. The prosecution's case concerning the remaining offenses was strong, including video evidence, DNA evidence regarding Fitch, cell phone evidence, and testimony from a fellow suspect. The trial court provided a limiting instruction that the jury could "consider evidence of gang activity only for the limited purpose of deciding whether the defendant acted with the intent, purpose, and knowledge that are required to prove the gang-related crimes and enhancements and special -- and enhancements charged, or the defendant had a motive to commit the crimes charged," and that the jury "may not consider this evidence for any other purpose." We presume the jury followed this instruction.

Lachan provides no convincing argument why the testimony concerning the "validated" or "documented" status of certain people as Taliban gang members or

testimony about "laws" or "rules" relating to debriefing would be so prejudicial as to impact the remaining offenses. One mention Adair made of Lachan as a "validated" Taliban member was successfully objected to, and Adair did not specifically testify that Lachan was an "active" Taliban gang member. Lachan does not explain how the other reference to him as a "validated" gang member might impact him concerning the remaining offenses.

Adair's testimony about "laws" and "rules" for debriefing gang members came in preliminary testimony regarding his training on gang members, not as substantive testimony to establish that Lachan or Fitch were, in fact, gang members. Soares did not refer to any "laws" or "rules" regarding debriefing. The prosecutor did not directly discuss either matter in his closing argument. In this situation, even assuming that prosecutorial misconduct occurred and Lachan's trial counsel performed deficiently by failing to object to such misconduct, we conclude there is no reasonable probability that, but for any such deficient performance, the result would have been more favorable to Lachan. (See *Samayoa*, *supra*, 15 Cal.4th at p. 845.)

### G. *Prosecutorial Misconduct—Direct Examination of Steward*

Steward testified pursuant to a cooperation agreement with no specific agreement as to what his sentence would be for his role in the robberies. Steward testified concerning robberies that he committed throughout the Bay Area with others in 2014 and 2015. In Steward's direct examination, the prosecutor covered the charged robberies with Steward, showing Steward videos of the robberies and eliciting testimony about his role and the role of others—including Lachan—in each robbery.

On cross-examination, Steward denied any involvement in or knowledge of a gang called the Taliban. The defense also challenged Steward's capacity to recall the details of the robberies, eliciting testimony that Steward had been under the influence of alcohol and drugs that affected his memory when he previously talked to police about this matter.

He also testified that "[t]here were a few" times he and Jordan committed robberies without Lachan or Fitch.

On redirect, Steward testified about his decision to implicate himself and others in the robberies. The prosecutor then asked Steward: "Now, during the course of when you were out 2014, March of 2014 to August 14th of 2015, there were numerous robberies. Would that be fair to say?" Steward replied affirmatively. The prosecutor then asked: "In fact, the robberies that we reviewed together when I first asked you questions, those are just a fraction of the robberies that were actually committed?" Lachan's trial counsel objected, stating that the question was not relevant and called for prejudicial evidence. Fitch's trial counsel added: "Facts in evidence. We don't have all those robberies." The trial court overruled the objections, but when Lachan's trial counsel then objected on the grounds that the question was argumentative, the trial court directed the prosecutor to restate the question for clarity. The prosecutor then asked: "Is it fair that the robberies that we reviewed were just a fraction of the robberies that you had committed?" The defense did not object to this question, and Steward replied, "Yes." The prosecutor then asked Steward: "And so when [police] were driving you around to all of these robberies, sometimes it was hard to keep track of specific dates when specific robberies happened or the locations; however, when you went to the locations, it refreshed your recollection as to what happened?" Steward replied in the affirmative. The prosecutor then asked Steward a series of questions about his interactions with police and district attorney's office personnel concerning his visits to robbery locations and viewing of video footage to identify who took part in which robberies.

Lachan contends that the prosecutor committed misconduct when he asked Steward about evidence of uncharged robberies. The Attorney General responds that the prosecutor's question did not constitute misconduct because: "To explain that the police drove him to various robbery sites to help him remember the details of his crimes, and to counteract the defense insinuation that the police were feeding him what they wanted him

60

to say, the prosecutor elicited that Steward committed many more crimes than those he testified about in this trial." We agree with the Attorney General's position.

"It is misconduct for a prosecutor to violate a court ruling by eliciting or attempting to elicit inadmissible evidence in violation of a court order. [Citation.]" (*People v. Crew* (2003) 31 Cal.4th 822, 839 (*Crew*).) "A defendant's conviction will not be reversed for prosecutorial misconduct, however, unless it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct." (*Ibid.*) " '[A] defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety. [Citation]' [Citation.]" (*People v. Stanley* (2006) 39 Cal.4th 913, 952.)

The record demonstrates that the prosecutor did not elicit inadmissible evidence concerning other, uncharged robberies that Lachan committed, and thus the prosecutor did not commit misconduct. The prosecutor's questions concerning the totality of the robberies committed established how Steward was able to identify the locations and participants in various robberies and explained gaps in Steward's memory about specific instances. On redirect examination, the prosecutor attempted to have Steward explain how he was able to recall details of specific robberies when he had testified that he committed numerous robberies without significant advance planning. The prosecutor's first question about the totality of the robberies committed—whether the robberies discussed on direct were "just a fraction of the robberies that were actually committed"— did not specifically call for Steward to state who had committed any such additional robberies. Thus, in response to a defense objection the trial court directed the prosecutor to restate the question for clarification. Then, the prosecutor more specifically asked whether the robberies discussed on direct "were just a fraction of the robberies that you had committed?" This rephrased question focused on any additional robberies Steward—

61

not Lachan or Fitch—committed, as the lack of a defense objection to this second question indicated.

Even if this issue were not forfeited by the lack of an objection to the rephrased question, Lachan has not established that prosecutorial misconduct occurred.  The prosecutor asked one question in this regard, which does not comprise a " ' "a pattern of conduct 'so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process.' " ' [Citations.]" (*Samayoa*, *supra*, 15 Cal.4th at p. 841.)  Following this one question, the prosecutor then asked a series of questions about how Steward worked with police and district attorney's office personnel to refresh his recollection about the details of specific robberies.  Read in context, this one question from the prosecutor did not elicit evidence of uncharged misconduct by Lachan but rather put efforts to refresh Steward's recollection in context.

Even assuming this question did constitute prosecutorial misconduct, Lachan would not be entitled to relief.  Given the one question and answer on this subject in the course of lengthy testimony by Steward, and the strength of the evidence against Lachan that he committed the charged offenses, it is not reasonably probable that a result more favorable to Lachan would have been reached without the alleged misconduct.  (See *Crew*, *supra*, 31 Cal.4th at p. 839.)

### H. *Substantial Evidence—Ex-Felon Element of Weapons Possession Count (Count 74)*

Lachan contends that the prosecution failed to produce substantial evidence of the "convicted felon" element of the weapons possession count (count 74).  Lachan argues that the trial court's actions "resulted in the elimination of one of the necessary elements of the crime defined in section 29800, subdivision (a)(1)," specifically, the element that Lachan was previously convicted of a felony.  The Attorney General responds that Lachan forfeited this issue because he stipulated that he was prohibited from owning or possessing a firearm as alleged in count 74, and alternatively, that Lachan's argument is

without merit in part because Lachan's stipulation to being a person prohibited from possessing a firearm "subsumed the fact of his felony conviction." We conclude that substantial evidence supports the conviction on this count based on Lachan's stipulation to the element at issue.

### 1. *Factual background*

Count 74 alleged that Lachan violated section 29800, subdivision (a)(1) by owning, purchasing, receiving, and possessing a firearm after having been previously convicted of a felony, carrying a concealed weapon.[12] Fitch was charged with an identical offense in count 73. In discussions regarding jury instructions, the trial court raised CALCRIM Nos. 2510 and 2511, which address section 29800 among other related provisions. CALCRIM No. 2510 addresses possession of a firearm by a person prohibited due to a prior conviction where there is no stipulation regarding the prior conviction, while CALCRIM No. 2511 covers situations in which the defendant stipulates to the prior conviction. The trial court asked Fitch to consult with his counsel and advise the court the following day which one of these instructions he wanted the trial court to utilize, noting that if Fitch did not stipulate to the prior conviction, the prosecutor would be permitted to argue the existence and nature of the prior conviction. The following day, counsel for both Lachan and Fitch informed the trial court that their clients elected to use the instruction that is to be utilized when the defendant stipulates to the prior conviction.[13]

---

[12] Section 29800 covers a situation where a person owns, purchases, receives, "or" has in possession "or" under custody "or" control a firearm when prohibited from doing so by virtue of a prior felony conviction or other disqualifying circumstance. (*Id.*, subd. (a)(1).) The second amended information alleged that Lachan owned, purchased, received, "and" possessed "and" had under his custody "and" control a firearm when prohibited from doing so by virtue of his prior felony conviction.

[13] Our reading of the record indicates that the trial court and counsel referred to CALCRIM No. 2510 when they meant the substance of CALCRIM No. 2511, and vice (continued)

Accordingly, the trial court instructed the jury in accordance with CALCRIM No. 2511, stating: "To prove that the defendant is guilty of this crime, the People must prove that, 1, the defendant possessed a firearm; 2, the defendant knew that he possessed the firearm; and 3, the defendant was prohibited from possessing a firearm." The trial court further stated in accordance with CALCRIM No. 2511: "The People and each defendant have stipulated or agreed that Jason Fitch and Alan Lachan were prohibited from possessing a firearm on or about and between November 19, 2014, and July 17, 2015. This stipulation means that you must accept this fact as proved." Neither Lachan nor Fitch objected to the instruction given.

After the trial court instructed the jury and the prosecutor delivered his closing argument, the trial court advised Lachan and Fitch: "So, gentlemen, here's the thing, the jury is not told about that conviction in [the prosecutor's] argument. There's evidence of it in an exhibit, but [the jury] may not be able to figure this out. But based on the stipulation that we had that you guys wanted the instruction that just said possession when prohibited from doing so, as opposed to because you're a felon, I need to have you admit that element of the offense for purposes of Count 73 and Count 74. [¶] Do you understand what I'm asking?" Fitch replied that he did not understand.

The trial court then explained as follows: "[Y]ou're charged in Count 73 with possession of a firearm by a felon, and one of the elements is that you were previously convicted of concealed firearm -- possession of concealed firearm, the [section] 12021. [¶] The jury is not going to have an Information that alleges that felony conviction. They're not going to have it, because you guys stipulated not to do that. So what I need

versa. The trial court and the parties referred to the instruction given in this matter as CALCRIM No. 2510, which is normally used when no stipulation exists, rather than CALCRIM No. 2511. However, the trial court and the parties agreed that the instruction to be given involves a situation when a defendant stipulates to a prior conviction, and the wording of the instruction the trial court gave without objection matches CALCRIM No. 2511, which is used when the defendant so stipulates.

64

to know -- what I need you to do is, essentially, admit that you have that felony conviction. Otherwise, I'm not going to give them the redacted, and I'm going to redo the instruction to them and tell them to find felon, and I'm going to let [the prosecutor] argue that, okay? Because it's kind of a step back from what you guys had agreed to. [¶] So all I'm asking is whether, in 2003, you were convicted of . . . possession of carrying a concealed firearm or possession of a firearm by a felon?"

Fitch raised additional questions about this matter, and the trial court again advised Fitch that if he did not want to admit the prior conviction that rendered him ineligible to possess a firearm, the jury would be instructed accordingly and the prosecutor could argue the existence and nature of the prior conviction. Fitch stated that he did not want to admit the prior conviction. Lachan then raised additional questions about what he was being asked to agree to, and after consulting with his counsel, he likewise stated that he did not want to admit the prior conviction.

The following day, both Lachan and Fitch stated that they had changed their minds again and now agreed to stipulate to this element. Lachan personally confirmed that he wished to stipulate that he was "prohibited from owning or possessing a firearm" as alleged in count 74.

## 2. *Legal principles and standard of review*

Section 29800, subdivision (a)(1) states that any person who has been convicted of a felony, who has been convicted of an enumerated offense, or who is addicted to the use of any narcotic drug "and who owns, purchases, receives, or has in possession or under custody or control any firearm is guilty of a felony." As relevant here: "This offense has three elements: (1) the defendant possessed a firearm, (2) the defendant knew that he possessed the firearm, and (3) the defendant had previously been convicted of a felony. [Citations.]" (*People v. Clark* (2021) 62 Cal.App.5th 939, 958.)

Where a defendant "will stipulate to ex-felon status, evidence of the *nature* of his prior convictions still may and should be withheld from the jury, since such evidence is

irrelevant to the ex-felon issue." (*People v. Valentine* (1986) 42 Cal.3d 170, 173.)  Thus, to prove the third element of a violation of section 29800, subdivision (a)(1), "one of two alternatives" may be used:  "(1) The prosecution can prove the conviction in open court, and that proof can include both the fact that the defendant has previously been convicted of a felony offense as well as the nature of the felony involved; or (2) the defendant can stipulate to having a felony conviction and thereby keep from the jury the nature of the particular felony."  (*People v. Sapp* (2003) 31 Cal.4th 240, 261.)  When the defendant stipulates to a prior conviction, "the court 'sanitizes' the prior by telling the jury that the defendant has a prior felony conviction, without specifying the nature of the felony committed."  (*Id.* at p. 262.)

"  'Generally, a party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language.'  [Citation.]  But that rule does not apply when . . . the trial court gives an instruction that is an incorrect statement of the law."  (*People v. Hudson* (2006) 38 Cal.4th 1002, 1011-1012 (*Hudson*).)

### 3. *Analysis*

Lachan stipulated that the third element of the charged offense under section 29800, subdivision (a)(1) was satisfied.  As charged, the reason Lachan was prohibited from possessing a firearm was his prior felony conviction.  The trial court repeatedly advised Lachan that he could either stipulate to the prior conviction and have the nature of the prior conviction sanitized, or allow the prosecutor to argue the existence and nature of the prior conviction.  Lachan elected to stipulate.  By admitting that he was prohibited from possessing a firearm, Lachan necessarily admitted his prior felony conviction.  While Lachan wavered as to whether to stipulate—first agreeing to stipulate, then withdrawing the stipulation before again stipulating that this element was met— Lachan ultimately agreed to the stipulation.

66

Lachan acknowledges on appeal that the jury had "significant evidence" that he had suffered prior convictions, including the carrying a concealed weapon felony conviction that formed the basis for Lachan's firearm possession prohibition as charged in count 74. Based on the existence of such significant evidence and the desire to avoid informing the jury of the nature of the prior conviction, Lachan stipulated to this element. Lachan does not contend on appeal that his stipulation was not knowing and voluntary and nothing in the record would support such a contention. We therefore conclude that substantial evidence supports Lachan's conviction of count 74.

To the extent that Lachan asserts that the trial court's instruction was erroneous by failing to specifically require the jury to find that Lachan was previously convicted of a felony, Lachan forfeited such a claim by not only failing to object to the instruction, but by agreeing that use of CALCRIM No. 2511 was appropriate. CALCRIM No. 2511 is utilized when the defendant has stipulated to having been previously convicted of a felony. (See Judicial Council of Cal., Crim. Jury Instns. (2013) Bench Notes to CALCRIM No. 2511 ["Use this instruction only if the defendant stipulates to the prior conviction"].) The trial court's instructions did not provide an incorrect statement of the law: to commit the offense, Lachan needed to have been in possession of a firearm at a time when he was prohibited to do so, and Lachan did, in fact, stipulate that he possessed a firearm at a time when he was prohibited to do so. Section 29800, subdivision (a)(1) provides multiple ways in which a defendant may be prohibited from possessing a firearm: having been convicted of a felony, having been convicted of an enumerated offense, and being addicted to the use of a narcotic drug. Thus, at most the trial court's instructions—instructions Lachan agreed to—were overly general or incomplete in informing the jury *why* Lachan was prohibited from possessing a firearm during the charged timeframe. As the instruction was not erroneous but at most overly general or incomplete and Lachan did not object to the instruction, Lachan has forfeited this issue. (See *Hudson*, *supra*, 38 Cal.4th at pp. 1011-1012.)

**I.** *Omission of Mandatory Unanimity Instruction—Possession of Firearm by Person Prohibited Offense*

Lachan next raises an additional issue regarding the instruction for count 74, asserting that his conviction on this count should be reversed because the trial court failed to give a unanimity instruction on this count to ensure that the jury agreed as to which act of weapons possession formed the basis for Lachan's conviction. The Attorney General concedes that the trial court should have provided a unanimity instruction, but argues that any error was harmless. We accept the Attorney General's concession of error, and we conclude that the error was harmless.

### 1. *Factual background*

As noted in the issue immediately above, Lachan was charged in count 74 with possessing a firearm from on or about November 19, 2014 through July 17, 2015 after having been convicted of a felony. The information did not specify during which robbery or robberies Lachan was alleged to have possessed a firearm. The prosecutor addressed this count and a similar count regarding Fitch (count 73) as follows in his closing argument: "When you look at Counts 73 and 74, they span the entire time of these robberies; so you can use any incident to find both the defendants guilty of being persons prohibited that were in possession of a firearm. I just picked one 'cause it was easy and we just saw it." The prosecutor also noted that Steward identified Lachan's voice in video of the Carl's Jr. robbery, and that the video showed both Lachan and Fitch possessing firearms during this robbery.

In the defense's closing arguments, Lachan's counsel acknowledged that the Carl's Jr. robbery represented "the one offense, the one count where the People and law enforcement make their strongest case against Alan Lachan." Lachan's counsel acknowledged that the video showed a person wearing clothing previously associated with Lachan, but argued that the evidence did not prove beyond a reasonable doubt that Lachan was the person depicted in the video.

68

The jury convicted Lachan of count 74 without having been instructed that they had to unanimously agree on which act of weapon possession formed the basis for this count.

### 2. *Legal principles and standard of review*

"Under the California Constitution, a unanimous jury verdict is required to convict a person of a crime. [Citations.] In particular, the jury must agree unanimously that the defendant is guilty of *a specific crime*. [Citation.] [¶] When a defendant is charged with a criminal offense, but the evidence suggests *more than one discrete crime*, either the People must elect among the crimes or the trial court must instruct the jurors that they all agree on the same criminal act. [Citations.] [¶] The requirement for a unanimity instruction ' "is intended to eliminate the danger that the defendant will be convicted even though there is *no single offense* which all the jurors agree the defendant committed." ' [Citation.]" (*People v. Sorden* (2021) 65 Cal.App.5th 582, 615 (*Sorden*).)

"As a general rule, when violation of a criminal statute is charged and the evidence establishes several acts, any one of which could constitute the crime charged, either the state must select the particular act upon which it relied for the allegation of the information, or the jury must be instructed that it must agree unanimously upon which act to base a verdict of guilty. [Citation.] There are, however, several exceptions to this rule. For example, no unanimity instruction is required if the case falls within the continuous-course-of-conduct exception, which arises 'when the acts are so closely connected in time as to form part of one transaction' [citation], or 'when . . . the statute contemplates a continuous course of conduct of a series of acts over a period of time' [citation]. There also is no need for a unanimity instruction if the defendant offers the same defense or defenses to the various acts constituting the charged crime. [Citation.]" (*People v. Jennings* (2010) 50 Cal.4th 616, 679.)

" 'It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the

evidence. [Citations.] The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case.' [Citations.]" (*People v. Diaz* (2015) 60 Cal.4th 1176, 1189.) Because determining whether the trial court should have given a unanimity instruction "involves a mixed question of law and fact which is ' "predominantly legal," ' we review de novo whether the specific instruction was required. [Citation.]" (*Sorden*, *supra*, 65 Cal.App.5th at p. 616.)

### 3. *Analysis*

The Attorney General concedes error in the failure to give a unanimity instruction, and we accept the concession. Lachan contends that this error must be assessed for prejudice under the standard set forth in *Chapman*. The Attorney General asserts that the error was harmless under either the *Chapman* standard or the less demanding standard for state law error set forth in *Watson*, without specifically arguing which standard applies in this situation. We conclude that the error is harmless under either standard.

"Under *Chapman*, '[w]here the record provides no rational basis, by way of argument or evidence, for the jury to distinguish between the various acts, and the jury must have believed beyond a reasonable doubt that [the] defendant committed all acts if he committed any, the failure to give a unanimity instruction is harmless.' [Citation.] For example, where the defendant offered the same defense to all criminal acts and 'the jury's verdict implies that it did not believe the only defense offered,' failure to give a unanimity instruction is harmless error. [Citation.] But if the defendant offered separate defenses to each criminal act, reversal is required. [Citations.]" (*People v. Hernandez* (2013) 217 Cal.App.4th 559, 577 (*Hernandez*).) "The error is also harmless '[w]here the record indicates the jury resolved the basic credibility dispute against the defendant and therefore would have convicted him of any of the various offenses shown by the evidence . . . .' [Citation.]" (*Ibid.*)

70

Lachan was charged with numerous instances of robbery over an extended period, with Lachan possessing a firearm during some of these robberies. For several of the robberies, the prosecution's evidence did not conclusively reveal whether Lachan was one of the people who possessed a firearm. However, the evidence demonstrated that Lachan did possess a firearm during the Carl's Jr. robbery, as shown by video footage from this robbery and testimony from Steward identifying Lachan's voice in the video. Thus, the prosecutor argued that this robbery represented the "easiest" example of Fitch and Lachan unlawfully possessing a firearm. Lachan did not dispute that a firearm was used in this robbery; instead, he disputed that he was the person depicted in the video possessing a firearm. The defense that Lachan offered to all the charged robberies was largely the same, arguing that witness identification, video footage, and cell phone evidence did not prove beyond a reasonable doubt that he participated in the robberies.

This is not a case where "[t]he different defenses gave the jury a rational basis to distinguish between the various acts"; instead, this was " 'a case where the jury's verdict implies that it did not believe the only defense offered.' [Citation.]" (*People v. Thompson* (1995) 36 Cal.App.4th 843, 853.) The jury was not presented with a situation in which some jurors might have concluded that Lachan possessed a firearm during one or more given robberies, while other jurors might have believed that Lachan possessed a firearm during one or more different robberies. Instead, one robbery provided particularly strong proof that Lachan possessed a firearm, and at a minimum, the jury would have unanimously concluded that Lachan unlawfully possessed a firearm during this robbery.

The jury's conviction of Lachan for each of the robberies, including the Carl's Jr. robbery, demonstrates that the jury resolved the basic credibility dispute unfavorably to Lachan. In this situation, " 'the jury must have believed beyond a reasonable doubt' " that Lachan " 'committed all acts if he committed any,' " and thus the failure to give a

71

unanimity instruction is harmless under the *Chapman* standard. (*Hernandez*, *supra*, 217 Cal.App.4th at p. 577.)

### J. *Modification of Sentences—Counts 5, 6, 41, 42, 60, and 61*

Lachan next argues that the trial court's imposed sentences concerning six counts of witness dissuasion must be modified because the sentences were calculated based on gang enhancements that must be vacated. These counts alleged violations of section 136.1, subdivision (c), which prohibits intimidation of witnesses or victims. Subdivision (b) of section 136.1 prohibits attempting to prevent or dissuade a victim of or a witness to a crime from reporting the victimization to law enforcement, causing a criminal case to be brought in the matter, or seeking the arrest of any person in connection with the victimization. Subdivision (c)(1) of section 136.1 is violated when a defendant does an act specified in subdivision (b) accompanied by force or by an express or implied threat of force or violence, while subdivision (c)(2) is violated when a defendant does an act specified in subdivision (b) knowingly and maliciously in furtherance of a conspiracy.

A violation of either provision normally is punishable by imprisonment for two, three, or four years. (§ 136.1, subd. (c).) However, in the instant case, counts 5, 6, 41, 42, 60, and 61 included gang allegations under section 186.22, subdivision (b)(4)(C). This provision states: "A person who is convicted of a felony enumerated in this paragraph committed for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further, or assist in criminal conduct by gang members, shall, upon conviction of that felony, be sentenced to an indeterminate term of life imprisonment with a minimum term of indeterminate sentence calculated as the greater of: [¶] . . . [¶] (C) Imprisonment in state prison for seven years, if the felony is . . . threats to victims and witnesses, as defined in Section 136.1." (§ 186.22, subd. (b)(4), (b)(4)(C).) The trial court sentenced Lachan to indeterminate life

terms on each of these counts, with the sentence for counts 6, 42, and 61 stayed pursuant to section 654.

The Attorney General asserts that because the gang offense must be reversed and the gang-related allegations must be vacated, the sentence for these counts will necessarily be affected. We agree that because this case is being remanded, the trial court can address this matter in the first instance should resentencing occur after the trial court's action in the RJA hearing.

### K. *Cumulative Effect of Errors*

Lastly, Lachan argues that the cumulative prejudicial effect of the errors asserted above deprived him of a fair trial. "Under the cumulative error doctrine, the reviewing court must 'review each allegation and assess the cumulative effect of any errors to see if it is reasonably probable the jury would have reached a result more favorable to defendant in their absence.' [Citation.]" (*People v. Williams* (2009) 170 Cal.App.4th 587, 646.)

We have found or assumed error with regard to: (1) Lachan's assertions that substantial evidence does not support his conviction for the gang offense and the true findings regarding gang-related allegations; (2) Lachan's claim that the playing and admission of rap music videos was improper under Evidence Code section 352; (3) Lachan's RJA claim regarding the admission of two rap videos; (4) Lachan's assertion that he received ineffective assistance of counsel for failure to object to and seek remedies for alleged prosecutorial misconduct concerning testimony about the "validated" or "documented" gang status of certain people or that "laws" and "rules" apply to debriefing; and (5) Lachan's argument that the trial court erroneously failed to provide a unanimity instruction regarding count 74 (felon in possession of a firearm). For issues one, two, and four, any errors did not affect the jury's remaining findings beyond the gang offense and gang-related allegations. By reversing the conviction for

73

the gang offense and vacating the gang-related allegations, any potential prejudice as a result of these issues is obviated. We have concluded that Lachan established a prima facie claim of an RJA violation regarding the playing and admission of rap music videos, and if the trial court concludes that an RJA violation has occurred following a hearing, it can impose an appropriate remedy for such a violation. The remaining issue regarding the lack of a unanimity instruction only affects one specific count, and we have found no prejudice to this count under the heightened *Chapman* standard. "We have considered each claim on the merits, and neither singly nor cumulatively do they establish prejudice requiring the reversal of the convictions." (*People v. Lucas* (1995) 12 Cal.4th 415, 476.)

## III. DISPOSITION

Lachan's conviction on count 2 (Pen. Code, § 186.22, subd. (a)) is reversed. The true findings on all Penal Code section 186.22, subdivision (b) allegations and all Penal Code section 12022.53, subdivision (e)(1) enhancements are vacated. The matter is remanded to the Superior Court of Santa Clara County.

Upon remand, the trial court shall conduct a hearing under Penal Code section 745, subdivision (c) concerning Lachan's claim that the playing and use of rap music videos at trial constituted racial bias or animus. If, following this hearing, the trial court finds by a preponderance of the evidence that a violation of the California Racial Justice Act has occurred, the trial court shall impose a remedy specific to the violation pursuant to Penal Code section 745, subdivision (e).

Following the trial court's action in the California Racial Justice Act hearing, the trial court shall resentence Lachan under current law if he remains convicted of one or more offenses. At resentencing, Lachan shall have the opportunity to allege any error in the trial court's sentence regarding counts 5, 6, 41, 42, 60, and 61.

_____
Greenwood, P. J.


WE CONCUR:




_____
Grover, J.




_____
Lie, J.




H051522
People v. Lachan